(300 P.3d 92)

No. 106,842

STATE OF KANSAS, *Appellee*, v. ISAAC BELTRAN, *Appellant*.

Opinion filed May 3, 2013.

*Korey A. Kaul* and *Samuel D. Schirer*, of Kansas Appellate Defender Office, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., BUSER and STANDRIDGE, JJ.

ATCHESON, J.: Defendant Isaac Beltran appeals the ruling of the Reno County District Court denying his motion to suppress cocaine and money a law enforcement officer discovered when he stuck his hand in Beltran's pocket during the execution of a search warrant at a house Beltran happened to be visiting. We affirm the district court but decline to do so on its determination the officer had probable cause to search Beltran or its alternative rationale based on inevitable discovery. The simple facts of this case filtered through the United States Supreme Court's established Fourth Amendment jurisprudence, most notably *Devenpeck v. Alford*, 543 U.S. 146, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004), lead to the paradoxical conclusion that although the officer expressly disclaimed any intent to arrest Beltran before the search, an objectively reasonable officer would have had probable cause to arrest Beltran for obstruction, and the search would have been constitutionally acceptable as an incident of that justifiable, if theoretical, arrest. Because search and seizure analysis is driven by objective reasonableness rather than subjective intent, as *Devenpeck* makes clear, the search comported with the Fourth Amendment to the United States Constitution, so the district court reached the right result.

## FACTUAL BACKGROUND AND CASE HISTORY

In the late afternoon on December 29, 2010, Reno County Sheriff's Deputy Shawn McClay participated in the search of a residence in South Hutchinson. The law enforcement team had gotten a search warrant to look for marijuana, cocaine, and evidence indicative of drug trafficking at the house. Neither the search warrant nor the underlying affidavit appears in the record on appeal. Only McClay testified at the hearing on Beltran's motion to suppress.

Beltran had no particular connection to the house—he did not own it, rent it, or live there. But he happened to be there when the officers arrived to search. McClay testified the team had iden-

tified suspects associated with drug trafficking at the house. Beltran was not among those persons either.

McClay knocked on the front door of the house and identified himself as a law enforcement officer. He also displayed a badge and wore clothing indicating he was a sheriff's deputy. As he approached the door, McClay saw a person he later identified as Beltran. Nobody responded to the door. After waiting about 20 seconds, McClay tried the knob and opened the door. He entered and immediately confronted Beltran. Beltran had not been alone in the house. Other occupants attempted to leave through the back door.

According to McClay, Beltran either put his left hand into the left front pocket of his pants or already had his hand there, and he then began to walk away toward the kitchen. McClay ordered Beltran to stop and apparently told him to take his hand out of his pocket. Beltran did not comply and continued walking toward the kitchen. From the testimony, it is not clear whether McClay repeated those commands. But Beltran plainly ignored them and continued to move away from McClay.

In his words, McClay then "made contact with" Beltran. Again, the testimony is not especially detailed on the point. McClay apparently grabbed Beltran's right hand and then pulled his left hand out of the pant pocket. While holding both of Beltran's hands in his right hand, McClay reached into the left front pocket of Beltran's pants and extracted two plastic bags containing what turned out to be cocaine and a third bag with $221 in it. McClay testified that he believed Beltran might have had a weapon or evidence in his pocket. On cross-examination, McClay agreed he had not placed Beltran under arrest at that point and had not seen him commit a crime.

During the search of the house, after McClay halted Beltran, officers found marijuana in the living room and a bedroom.

Beltran filed a motion to suppress the cocaine and money taken from his pants. The district court denied the motion. In its bench ruling, the district court characterized the question as a close one and concluded McClay had probable cause to search Beltran when he ignored the commands to take his hand out of his pocket and

to stop moving away. The district court also determined McClay would have inevitably discovered the contraband in Beltran's pocket because the marijuana found in the house solidified the probable cause to search Beltran.

Beltran later went to trial on stipulated facts, and the district court convicted him of possession of cocaine, a felony, in violation of K.S.A. 2010 Supp. 21-36a06. Beltran had no other adult convictions and no juvenile adjudications affecting his criminal history. The district court imposed a standard guidelines sentence of imprisonment for 11 months and followed the statutory presumption by placing Beltran on probation for 18 months. Beltran has timely appealed and asserts the denial of the motion to suppress as the only issue.

## LEGAL ANALYSIS

*Fourth Amendment Principles and Detention of Persons During Execution of Search Warrants*

In reviewing a district court's ruling on a motion to suppress, an appellate court applies a bifurcated standard. The appellate court accepts the factual findings of the district court if they are supported by competent evidence having some substance. The appellate court exercises plenary review over legal conclusions based upon those findings, including the ultimate ruling on the motion. *State v. Woolverton,* 284 Kan. 59, 70, 159 P.3d 985 (2007); accord *State v. Thompson,* 284 Kan. 763, 772, 166 P.3d 1015 (2007). The prosecution bears the burden of proving a search or seizure to be constitutional by a preponderance of the evidence. *State v. Pollman,* 286 Kan. 881, 886, 190 P.3d 234 (2008) (allocation of burden; quantum of evidence); *Thompson,* 284 Kan. at 772 (allocation of burden). Here, the facts were effectively undisputed, and the district court accepted McClay's rendition of the events. What remains—the application of those facts to the governing legal principles—is a question of law.

By its express language, the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." Absent a warrant from a judge, a government agent's search violates the Fourth Amend-

ment unless the circumstances fit within a recognized exception to the warrant requirement. *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 1858, 179 L. Ed. 2d 865 (2011) ("[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement."); *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) ("[W]arrantless searche[s] . . . 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " [quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)]). Here, the officers did not have a warrant authorizing them to search Beltran. So McClay's search must fit within a recognized exception to be reasonable under the Fourth Amendment. We, therefore, look at possible bases for a warrantless search of Beltran.

Armed with a search warrant for the house, McClay had the constitutional authority to detain Beltran as the officers looked through the place for contraband and evidence related to drug trafficking. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981) ("[F]or Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."). The authority of law enforcement officers to seize persons under *Summers* extends to anyone on the premises to be searched even if the individual has no ownership or possessory interest in the premises. See *Bailey v. United States*, 568 U.S. __, 133 S. Ct. 1031, 1043-45, 185 L. Ed. 2d 19 (2013) (Scalia, J., concurring); *United States v. Sanchez*, 555 F.3d 910, 916-19 (10th Cir. 2009).

But the search warrant did not permit law enforcement officers to conduct a full search of Beltran simply because he was on the premises. See *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979); *State v. Vandiver*, 257 Kan. 53, Syl. ¶ 2, 891 P.2d 350 (1995). In *Ybarra*, the Court recognized that "a search or seizure of a person must be supported by probable cause particularized with respect to that person." 444 U.S. at 91. In that

case, law enforcement officers had obtained a warrant to search a tavern and a particular bartender for narcotics. Ybarra was a customer apparently looking to get a drink at the bar when the warrant was executed. He had no other or greater connection to the establishment. Accordingly, the officers lacked probable cause to search him and could not overcome that constitutional deficiency simply because "coincidentally there exist[ed] probable cause to search or seize another or to search the premises where the person may happen to be." 444 U.S. at 91. The Court, however, indicated that if the officers had a reasonable suspicion Ybarra were armed and posed a threat, they could have, consistent with *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), conducted a limited pat-down search of him for weapons. 444 U.S. at 92-93; see *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009) (investigatory *Terry* stop may entail frisk or pat-down for weapons if officer reasonably suspects individual may be armed). The Kansas Supreme Court has embraced these principles. See *Vandiver*, 257 Kan. 53, Syl. ¶¶ 1-3. And they are essentially codified in K.S.A. 22-2509.

In an investigatory detention or *Terry* stop, law enforcement officers may halt and briefly question a person if they have a reasonable suspicion that, based on articulable facts, the individual has just committed, is committing, or may be about to commit a crime. See *Johnson*, 555 U.S. at 326-27; *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *Terry*, 392 U.S. at 21-23, 30. The suspicion of criminal involvement must be grounded in fact-based conclusions and not mere hunches, but an officer may rely on training and experience to deduce nefarious implications from conduct those outside the law enforcement field might view as entirely innocuous. See *Terry*, 392 U.S. at 22-23, 27; *State v. Martinez*, 296 Kan. 482, Syl. ¶ 4, 293 P.3d 718 (2013) (district court erred in finding that an experienced officer with a hunch possessed a reasonable suspicion of wrongdoing); accord *Brown v. Texas*, 443 U.S. 47, 52 n.2, 99 S. Ct. 2627, 61 L. Ed. 2d 357 (1979). During a *Terry* stop, an officer may conduct a pat-down search for weapons if the particular circumstances also suggest the individual may be armed and pose a threat. *Johnson*, 555

U.S. at 326-27 (investigatory *Terry* stop may entail frisk or pat-down search for weapons if officer reasonably suspects individual may be armed) *Terry*, 392 U.S. at 27, 29-30; *State v. White*, 44 Kan. App. 2d 960, 970-71, 241 P.3d 951 (2010).

In conducting a constitutionally acceptable pat-down search, a law enforcement officer is confined to "patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron v. New York*, 392 U.S. 40, 65, 88 S. Ct. 1889, 20 L. Ed. 2d 917(1968); *White*, 44 Kan. App. 2d at 964. Here, McClay exceeded the scope of a lawful pat-down when he reached into Beltran's pocket. *Sibron*, 392 U.S. at 65; *White*, 44 Kan. App. 2d at 970-71. His search of Beltran, if based on a reasonable suspicion, violated the Fourth Amendment. The district court, however, concluded McClay had probable cause to search Beltran and, therefore, could go beyond a pat-down for weapons. The district court erred in its conclusion.

Probable cause to search or seize imposes a higher threshold than reasonable suspicion. In the context of an arrest or seizure of an individual, probable cause requires an officer to have knowledge of facts that would lead a reasonably cautious person to believe a crime had been committed and the suspect committed it. *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979) ("This Court has repeatedly explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, the suspect has committed, is committing, or is about to commit an offense."); *Dunaway v. New York*, 442 U.S. 200, 208 n.9, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); see *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, 20-21, 290 P.3d 555 (2012). Probable cause for a search warrant requires that government agents possess specific facts leading a reasonable person to conclude evidence of a crime may be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (search warrant may issue when the supporting affidavit establishes "a fair probability that contraband or evidence of a crime will be found in a particular place"); *State v. Bottom*, 40 Kan. App. 2d 155,

161, 190 P.3d 283 (2008), *rev. denied* 287 Kan. 766 (2009). Those standards share the common requirements that a reasonable person be persuaded by particularized facts to believe the determinative proposition—either that the suspect committed a crime or that evidence of a crime may be found in a specific location. But probable cause to search is not interchangeable with probable cause to arrest in the sense that facts supporting a search warrant for a particular place do not necessarily establish criminal conduct on the part of someone with a possessory interest in that place or someone merely present there when the search is carried out. A search warrant alone is not a basis to arrest an individual for a criminal offense. See *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 & n.6, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978) (pointing out differing legal implications of probable cause supporting a search warrant and probable cause permitting an arrest).

If, however, law enforcement officers have probable cause to arrest a person, they may make a full search of the individual as part of that process. *Gant*, 556 U.S. at 339; see *Thompson*, 284 Kan. 763, Syl. ¶ 11. Probable cause to search a person may also be combined with recognized exigent circumstances to permit a full warrantless search of him or her without grounds for an arrest. *Vandiver*, 257 Kan. at 62; *State v. Houze*, 23 Kan. App. 2d 336, Syl. ¶ 1, 930 P.2d 620 ("A warrantless search of a person is permissible where there is probable cause for the search and exigent circumstances justify an immediate search."), *rev. denied* 261 Kan. 1088 (1997); *United States v. Banshee*, 91 F.3d 99, 102 (11th Cir. 1996); accord *United States v. Robinson*, 414 U.S. 218, 227-28, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973) (" 'A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation.' ").

We now apply those principles to McClay's search of Beltran.

*Officers Had No More Than Reasonable Suspicion Beltran Possessed Weapons or Contraband*

Based on the record evidence and fully crediting McClay's testimony, as the district court did, we do not share its conclusion

that an officer would have had more than a reasonable suspicion that Beltran possessed a weapon or contraband. Beltran's late afternoon presence at a house the officers had good reason to believe was the site of ongoing drug dealing cannot itself amount to probable cause to conclude he had a weapon or illegal drugs. Beltran had no particular connection to the house. At the time the officers arrived, they had no basis other than his presence there to assume his involvement in drug trafficking, either as a buyer or seller, or in any other criminal activity. As we explain, Beltran's evasive conduct, as the search progressed, furnished no more than reasonable suspicion. Courts reviewing comparable circumstances have so concluded.

Under *Summers*, McClay could have properly detained Beltran while the officers executed the search warrant by looking through the house. But the detention is akin to a *Terry* stop in character. It could be no more intrusive or lengthy than necessary to accomplish the officers' purpose in safely searching the house without undue interference from the persons present. See *Bailey*, 133 S. Ct. at 1037-43; *Summers*, 452 U.S. at 702-03.

An experienced narcotics officer might suspect that a person found at a likely drug house during the execution of a search warrant could be armed. See *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."); *United States v. McKissick*, 204 F.3d 1282, 1293 (10th Cir. 2000) (recognizing that "guns are 'tools of the trade' in the distribution of illegal drugs"). The existence of a search warrant shows that law enforcement officers have (at a minimum) sufficient current, reliable information to satisfy a judge that illegal drugs and other contraband or evidence of unlawful activity may be found there. That's considerably more than an unverified tip or casual observations suggesting a place might be a haven for drug trafficking—limited reconnaissance that likely fails to establish reasonable suspicion for even experienced police officers to stop persons entering or leaving the premises, let alone to search them. *United States v. Swindle*,

407 F.3d 562, 569 (2d Cir. 2005) ("entering a known drug house alone does not itself suggest a crime is afoot"). Nonetheless, the courts generally have not equated a person's presence at the site of drug trafficking to the sort of fact-based reasonable suspicion recognized in *Terry* as authorizing a pat-down search for weapons. And *Ybarra* goes further in holding that the probable cause supporting a search warrant does not directly transfer to a person found on the premises so as to supply reasonable suspicion for a pat-down of the individual without something more. 444 U.S. at 92-93; see *United States v. Ritter*, 416 F.3d 256, 268-69 (3d Cir. 2005) (Citing *Ybarra*, the court affirmed the suppression of drugs found on an individual during a pat-down by officers executing search warrant for illegal drugs at a house when they had no particularized reason to conclude the person was armed.); *Denver Justice & Peace v. City of Golden*, 405 F.3d 923, 929-30 (10th Cir. 2005) (distinguishing the *detention* of individual permitted by *Summers* from even a limited *search* of that person absent particularized reasonable suspicion). In light of that authority, McClay could not have conducted a constitutionally acceptable pat-down of Beltran simply based on his presence at the drug house.

If items sought in a search warrant include guns or evidence of violent crimes, the circumstances arguably might be sufficiently different to permit officers to use more intrusive measures in handling anyone on the premises. But even then, the officers could not exceed *Terry*-type pat-downs in searching persons on the premises. See *Muehler v. Mena*, 544 U.S. 93, 99-100, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005) (no Fourth Amendment violation when officers handcuffed occupants of house where known gang members lived during execution of search warrant for firearms); *Denver Justice & Peace*, 405 F.3d at 930-31 (suggesting the possibility that in certain situations officers executing a search warrant for a particular place might constitutionally conduct limited searches of the individuals at the scene based on the nature of the evidence being sought); *United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (Distinguishing *Ybarra*, the court upheld the search of a handbag belonging to a woman who arrived in the company of two known drug dealers at an apartment being searched pur-

suant to a warrant that had already yielded firearms and narcotics.). Here, the record indicates the search warrant specified only drugs and related items but not weapons or evidence related to violent crimes.

In the same vein, an experienced narcotics officer could well consider a person's unexplained presence inside a known drug house to be at least noteworthy and more likely suspicious. But to the extent the courts have considered roughly similar facts, they generally have rejected mere presence as supporting a constitutionally acceptable *Terry* stop of the individual based on reasonable suspicion of criminal activity. *Ybarra*, 444 U.S. at 94-95; *Ritter*, 416 F.3d at 269 & n.12; see *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Inferring criminal intentions from mere presence apparently tilts more toward a constitutionally infirm hunch. Here, there was really nothing more at the beginning of the search. Beltran was there in the late afternoon and had not been seen frequenting the house under unusual circumstances, as, for example, making repeated visits lasting only a few minutes each. Nor did he have a documented history of involvement with illegal drugs indicated by reliable informants or criminal convictions. We decline to speculate on what historical information of that type might elevate an individual's mere presence to a reasonable suspicion of possible criminal activity.

McClay had no legally significant, particularized grounds to consider Beltran to be armed or in possession of contraband when they first encountered each other. To the contrary, McClay properly sought to detain Beltran under the *Summers* rule applicable to anyone found on premises being searched pursuant to a warrant. The *Summers* rule requires no individualized cause to detain a person; his or her presence on the premises at the time of the search is legally sufficient in and of itself. *Bailey*, 133 S. Ct. at 1037-38 (Characterizing the *Summers* rule as "categorical," the Court recognizes detaining an individual on that basis "does not require law enforcement officers to have particular suspicion that an in-

dividual is involved in criminal activity or poses a specific danger to the officers."). Indeed, the rule's very purpose is to allow law enforcement officers to briefly confine and control individuals occupying a place subject to a search warrant, thereby reasonably facilitating the task of searching when the officers otherwise would have no constitutional basis to do so. See 133 S. Ct. at 1037-43. The rule is one of necessity and imposes (in a limited way) on the freedom of an individual only because of his or her presence in a particular place at a particular time and not because of any specific action or behavior arousing the suspicion of law enforcement officers. In short, the detention becomes constitutionally reasonable because it is attendant to the search of a particular place based on a judicially issued warrant—a proper exercise of government authority expressly recognized in the Fourth Amendment—and has been deemed necessary to accomplish that search. But given that purpose, the imposition necessarily must be a carefully limited one to satisfy the constitutional requirement of reasonableness.

In this case, though, there was more than mere presence as the search unfolded. Beltran did not provide a static backdrop to the officers' investigation. He deliberately attempted to evade McClay by walking away and refusing to take his hand out of his pocket contrary to the officer's directions. That conduct also must be taken into account in assessing reasonable suspicion and probable cause. A court should view all of the relevant circumstances collectively in assessing the reasonableness of a search for Fourth Amendment purposes. *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 619, 109 S. Ct. 1042, 103 L. Ed. 2d 639 (1989) ("What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search and seizure itself.' " [quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985)]); see *Sloop*, 296 Kan. at 20-21; *State v. Sanchez-Loredo*, 294 Kan. 50, 55-56, 272 P.3d 34 (2012). So Beltran's presence at the house should be combined with his evasive actions after McClay entered. But that holistic review doesn't appreciably advance the prosecution's cause. The courts have consistently recognized an individual's furtiveness or flight as contributing to reasonable suspicion, though

not demonstrating probable cause. *Wardlow*, 528 U.S. at 124-25 ("evasive behavior" and "unprovoked flight," especially in a high-crime area, are "pertinent factor[s] in determining reasonable suspicion"); *United States v. Navedo*, 694 F.3d 463, 474 (3d Cir. 2012) ("unprovoked flight, without more, cannot elevate reasonable suspicion to detain and investigate into the probable cause to arrest"); *United States v. Johnson*, 620 F.3d 685, 694-95 (6th Cir. 2010) (collecting cases); *Jenkins v. City of New York*, 478 F.3d 76, 89 n.12 (2d Cir. 2007); *United States v. Garcia*, 441 F.3d 596, 598 (8th Cir. 2006) (officer had reasonable suspicion for investigatory stop when individual left known drug house and "act[ed] in a furtive manner . . . concealing something in his pants"); *State v. Boyer*, 967 So. 2d 458, 471-72 (La. 2007) (officer had reasonable suspicion for pat-down search for weapons when individual at scene of execution of search warrant for drugs refused to comply with an order to remove his hand from his pocket); *State v. Talley*, 145 N.M. 127, 133-34, 194 P.3d 742 (2008) (refusal to remove hand from pocket in response to officer's order contributed to reasonable suspicion individual might be armed and potentially dangerous).

The *Summers* rule allowing the detention of Beltran does not enhance the effect of Beltran's evasive conduct to furnish McClay with *particularized* reasonable suspicion or probable cause over and above what might be reflected in that conduct itself. In other words, Beltran's presence at the house did not combine synergistically with his evasive actions to create some fortified form of particularized reasonable suspicion or probable cause. Apart from triggering the *Summers* rule, Beltran's mere presence had little, if any, significance for Fourth Amendment purposes, and his evasive conduct in that context fostered a reasonable suspicion but no more. So the circumstances would have permitted McClary, at most, to conduct a pat-down search of Beltran for weapons.

In some situations, the cumulative effect of a series of actions that individually might appear innocent can foster a reasonable suspicion of criminal conduct just past, actively underway, or in the offing. See *Wardlow*, 528 U.S. at 125. The *Wardlow* Court cited the facts of *Terry* as illustrative of just that sort of situation where an experienced detective reasonably suspected an incubating rob-

bery as a pair of men separately walked by and peered into a store window half a dozen times, conferred between those visits, and met with a third man during a 10- to 12-minute interval. See 528 U.S. at 125. Beltran's conduct here was not nearly so expansive. He did not engage in concerted actions over an extended period that an experienced law enforcement officer might aggregate into reasonable suspicion or more. He briefly engaged in evasive conduct consisting of walking away from McClay and keeping his hand in his pocket—circumstances that could provoke no more than reasonable suspicion. Had McClay seen Beltran pick up something from the house and place it in his pocket, the facts would move closer to and might substantiate probable cause, especially coupled with his refusal to take his hand out of his pocket and to stay put despite commands to do so. But MClay made no such observation.

The State mentions K.S.A. 22-2509 in a single sentence of its brief as supporting McClay's search of Beltran for officer safety. The statute, however, really doesn't advance the State's position. Enacted in 1970, K.S.A. 22-2509 permits an officer executing a search warrant to "reasonably detain and search any person" found on the premises to "protect himself from attack" or to "prevent the disposal or concealment" of items identified in the warrant. By couching the authority extended to officers in terms of reasonableness, the Kansas Legislature effectively incorporated developing Fourth Amendment jurisprudence into the statute to define permissible conduct.

The Fourth Amendment, as we have noted, prohibits government agents from engaging in "unreasonable searches and seizures" generally. The statute codifies the authority of law enforcement officers to effect searches and seizures in the particular context of executing search warrants. But that statutory authority cannot exceed the limitations on government action imposed in the Fourth Amendment. See *Sibron*, 392 U.S. at 60-61 (A state "may develop its own law of search and seizure to meet the needs of local law enforcement," but it "may not authorize police conduct which trenches upon Fourth Amendment rights."); see *State v. Lawson*, 296 Kan. 1084, Syl. ¶ 3, 297 P.3d 1164 (2013) (State law may impose greater restrictions on police activity than required to

satisfy federal constitutional limitations.); 296 Kan. 1084, Syl. ¶ 4 ("[A] state may not deny, restrict, narrow, or interfere with any of the federally guaranteed constitutional rights."). The statute would otherwise be unconstitutional.

K.S.A. 22-2509 was adopted before *Ybarra*, 444 U.S. 85, and *Summers*, 452 U.S. 692, and must be applied in conformity with those decisions and other controlling Fourth Amendment precedent. Those rulings give legal meaning to what may be considered reasonable under the statute. The Illinois statute the United States Supreme Court found to have been unconstitutionally applied to search the defendant in *Ybarra* is virtually identical to K.S.A. 22-2509. *Ybarra*, 444 U.S. at 87 n.1. So K.S.A. 22-5509 must be similarly construed and cannot confer authority on law enforcement officers executing a search warrant to search anyone found on the premises for weapons absent particularized facts demonstrating reasonable suspicion a given individual is armed and poses a threat. And then officers are limited to a pat-down search. As we have discussed, the circumstances here did not establish probable cause to conclude Beltran was armed, a prerequisite to a warrantless full-body search based on exigent circumstances.

The district court, therefore, erred in concluding the facts known to McClay at the time he reached into Beltran's pocket established probable cause that Beltran had a weapon or illegal drugs. While McClay could have patted Beltran down, he exceeded the boundaries of a permissible Fourth Amendment search by doing more. The district court, however, buttressed its conclusion by finding, alternatively, that McClay inevitably would have discovered the drugs and money in Beltran's pocket. We now turn to that secondary basis for the district court's ruling.

*Inevitable Discovery Doctrine Fails to Salvage Search*

The inevitable discovery doctrine permits the admission of otherwise unconstitutionally seized evidence if law enforcement officers eventually would have found that evidence without violating the Fourth Amendment. See *Nix v. Williams*, 467 U.S. 431, 444-47, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984) (adopting doctrine in context of Sixth Amendment violation and noting comparable con-

siderations in applying inevitable discovery to Fourth Amendment violations); *State v. Ingram*, 279 Kan. 745, 750, 113 P.3d 228 (2005) (doctrine applied to Fourth Amendment violation); *State v. Johnson*, 46 Kan. App. 2d 387, 396-97, 264 P.3d 1025 (2011), *rev. denied* 293 Kan. 1111 (2012); *United States v. Crespo-Rios*, 645 F.3d 37, 42 (1st Cir. 2011). The prosecution must show by a preponderance of the evidence that the illegally seized objects otherwise would have turned up during the police investigation. *Nix*, 467 U.S. at 444; *Ingram*, 279 Kan. at 750. And the means of inevitable discovery must be independent of the police conduct tainting the evidence in the first instance. See *Murray v. United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988); 487 U.S. at 544-45 (Marshall, J., dissenting); *Crespo-Rios*, 645 F.3d at 42 (evidence admissible when its discovery would have occurred " ' "without reference to the police error or misconduct" ' "); *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010) (doctrine applicable if the evidence inevitably "would have been discovered by lawful means").

In this case, the district court held that after the officers searching the house found marijuana in the living room, where McClay encountered Beltran, and a bedroom, having no apparent connection to Beltran whatsoever, they inevitably would have discovered the cocaine and money Beltran had in the pocket of his pants. The district court reasoned that the marijuana would have furnished enough additional information to support probable cause, apparently either to search or arrest Beltran, thus leading to the constitutionally permissible discovery of those items. The district court's reasoning was flawed on that score in light of a string of Kansas appellate court decisions holding that illegal drugs found in the common area of a residence may not, without more, be attributed to a guest or nonresident. See *State v. Beaver*, 41 Kan. App. 2d 124, Syl. ¶ 6, 200 P.3d 490 (2009); *State v. Marion*, 29 Kan. App. 2d 287, 290, 27 P.3d 924, *rev. denied* 272 Kan. 1422 (2001); *State v. Cruz*, 15 Kan. App. 2d 476, 489, 809 P.2d 1233, *rev. denied* 249 Kan. 777 (1991); *cf. State v. Anthony*, 242 Kan. 493, 502-03, 749 P.2d 37 (1988) (noting rule but finding it inapplicable where drug

paraphernalia and evidence of trafficking were found in residence where defendant lived alone).

The *Beaver* court aptly summarized the Kansas authority this way:

"[W]here illicit drugs were found in a residence and where the evidence showed that a defendant was nothing more than a social guest on the premises, the defendant's mere presence in the home and the defendant's proximity to the illicit drugs were insufficient to show probable cause to believe that the defendant was in constructive possession of the illicit drugs." 41 Kan. App. 2d 124, Syl. ¶ 6.

In that case, law enforcement officers found illegal drugs and drug paraphernalia in plain view on the kitchen table, near where they seized Beaver in the residence. But the court held that those circumstances were insufficient to establish probable cause to conclude Beaver had actual or constructive possession of the contraband in light of the countervailing facts that he was a social guest rather than a resident, nothing belonging to him was close to or intermingled with the illegal items, he was not known to the officers as a suspected drug trafficker, and he had not otherwise acted suspiciously. *Beaver*, 41 Kan. App. 2d at 131-32.

The facts here are roughly comparable. Beltran was a visitor to the house and had no apparent connection to the marijuana found there. McClay did not recognize Beltran to be someone law enforcement had already associated with drug trafficking. Based on the information the officers used to get the search warrant, they expected to find illegal drugs in the house when McClay seized Beltran and searched him. So the actual discovery of the marijuana may have confirmed their expectations but didn't appreciably change their assessment of the overall situation. And Beltran's evasive conduct alone is not enough to vault those circumstances into probable cause to reasonably conclude he had drugs or contraband in his pocket.

After the officers discovered the marijuana in the living room, Beltran's evasive actions might have been construed as indicating his knowledge of the marijuana. But, as recognized in *Beaver* and the other case authority, those actions would not show a possessory interest. As we suggested earlier, Beltran's conduct did not reflect some direct connection to the marijuana—in contrast to, say, his

apparently grabbing something from the general vicinity of the marijuana and then placing his hand in his pocket. Rather, the discovery of the marijuana coupled with the evasive conduct would have given the officers reasonable suspicion for a *Terry* detention based on Beltran's possible involvement in criminal activity, allowing them to briefly hold him and ask about his actions. The legal basis for holding Beltran at that point would be different from a *Summers* detention, since it would rest on a particularized reasonable suspicion in contrast to the categorical ground of simply being present during the execution of a search warrant. But any search of Beltran still would have been limited to a pat-down for weapons—something we have already recognized McClay could have done under *Summers* in light of Beltran's refusal to remove his hand from his pocket.

Nothing in the record suggests a properly conducted pat-down would have caused McClay to reasonably mistake the plastic bags and their contents for a weapon or to correctly recognize them to be likely contraband. So the cocaine and money could not be admitted on the grounds that a proper pat-down search inevitably would have revealed them. See *Minnesota v. Dickerson*, 508 U.S. 366, 375-76, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993) (plain-feel exception allows office to seize object reasonably believed to be contraband based on a constitutionally proper pat-down search); *State v. Wonders*, 263 Kan. 582, 590, 952 P.2d 1351 (1998) (same); see also *United States v. Clay*, 483 F.3d 739, 743-44 (11th Cir. 2007) (officer may continue *Terry* pat-down search if he or she "feels a concealed object that he [or she] reasonably believes may be a weapon").

The district court erred in concluding the discovery of the marijuana would have sufficiently changed the Fourth Amendment calculus by establishing probable cause and, in turn, leading to the inevitable discovery of the cocaine and money in Beltran's pocket. And a pat-down search would not have inevitably revealed the items.

*Objectively Reasonable Officer Had Probable Cause to Arrest Beltran for Obstruction, Rendering Search Constitutionally Proper*

Both the district court's primary and secondary rationales for upholding McClay's search of Beltran fail. That, however, does not end the inquiry. A district court reaching the right result may be affirmed even though it may have relied on a faulty legal analysis. See *State v. Robinson*, 293 Kan. 1002, 1025, 270 P.3d 1183 (2012); *State v. Shaw*, 242 Kan. 127, Syl. ¶ 4, 744 P.2d 824 (1987) ("Where a trial court reaches the correct result based upon the wrong reason, this court will affirm the trial court."). This is such a case, based on a loose variant of the district court's inevitable discovery approach. An objectively reasonable law enforcement officer would have had probable cause to arrest Beltran for obstruction and, in turn, could have searched him incident to that arrest. Because the Fourth Amendment measures the reasonableness of searches and seizures using that objective standard, the search of Beltran was proper even though McClay did not subjectively intend to search him for that reason. We first explain why the facts establish probable cause to arrest and then review how the objective reasonableness standard renders the search acceptable under the Fourth Amendment.

The facts known to McClay at the point he grabbed Beltran and searched his pocket established probable cause for a reasonable law enforcement officer to conclude Beltran had committed the crime of obstruction in violation of K.S.A. 21-3808, the statute then in effect. As provided in K.S.A. 21-3808(a), a person commits that offense by "obstructing, resisting, or opposing any person authorized by law to serve process in the service or execution [of] any . . . warrant. . . . or in the discharge of any official duty." The statute applies when law enforcement officers execute a search warrant. *State v. Seabury*, 267 Kan. 431, 438, 985 P.2d 1162 (1999). The offense is then a misdemeanor, although obstructing law enforcement officers in other situations may be a felony. See K.S.A. 21-3808(b)(1), (2); *Seabury*, 267 Kan. at 438. The sort of conduct violating the statute has been broadly defined. *State v. Lee*, 242 Kan 38, 40, 744 P.2d 845 (1987). The classic characterization of

the offense appears in *State v. Merrifield*, 180 Kan. 267, 270, 303 P.2d 155 (1956):

"The statute does not limit the offense to resistance alone. It includes also willful acts of obstruction or opposition, and to obstruct is to interpose obstacles or impediments, to hinder, impede or in any manner interrupt or prevent, and this term does not necessarily imply the employment of direct force, or the exercise of direct means. It includes any passive, indirect or circuitous impediments to the service or execution of process[.]"

See *State v. Parker*, 236 Kan. 353, 361, 690 P.2d 1353 (1984) (identifying *Merrifield* as the leading Kansas case on obstruction). The conduct, however, must have "substantially hindered or increased the burden of the officer" in carrying out the official task or duty at hand, so verbal criticism of the officer would likely not violate the statute. See *Parker*, 236 Kan. at 364.

Disregarding a law enforcement officer's order to stop may violate K.S.A. 21-3808(a). See *State v. Dugan*, 47 Kan. App. 2d 582, 603, 276 P.3d 819 (2012); *State v. Little*, 116 Wash. 2d 488, 497-98, 806 P.2d 749 (1991). Similarly, refusing to obey an officer's order to keep one's hands in plain sight may support an obstruction charge. See *Edwards v. State*, 253 Ga. App. 837, 839, 560 S.E.2d 735 (2002) (refusal to remove hands from pockets in response to police command during encounter at site of suspected drug trafficking furnished probable cause to arrest for obstruction); *State v. Hodges*, 631 N.W.2d 206, 211 (S.D. 2001) (individual's refusal to obey police commands to stop and to place hands in sight provided probable cause to arrest for obstruction); *State v. Contreras*, 92 Wash. App. 307, 315-17, 966 P.2d 915 (1998) (individual's refusal to keep hands on dashboard and visible to officer during car stop would support arrest for obstruction, especially combined with refusing to then get out of the car and later giving a false name). Where, as here, an individual refuses to comply with those sorts of commands during the execution of a search warrant, probable cause to arrest for obstruction seems apparent.

Based on the undisputed facts, McClay clearly announced both his status as a sheriff's deputy—something that was also obvious from his dress and badge—and his purpose in entering the house. Under *Summers*, McClay also had the legal authority to detain

Beltran to enhance officer safety and to facilitate the search. As the Kansas caselaw establishes, an individual need not physically oppose a law enforcement officer, in the sense of committing a civil or criminal battery, to be guilty of obstruction. Rather, the individual must in some material way oppose or impede the officer in carrying out an official duty, here the execution of the warrant. Beltran's refusal to stop and stay put alone was enough. Officers cannot effectively search a building if the occupants can move about with the freedom to hide or destroy potentially incriminating evidence. When Beltran disobeyed a direct order to display his hand, he only escalated the impediment. McClay was legitimately concerned that Beltran might be holding a handgun or another weapon. That uncertainty, cutting to the core of officer safety, interfered with McClay's ability to readily and efficiently search the house. For what seem to be obvious reasons, McClay chose not to allow the uncertainty to persist. He quickly intervened so he could see Beltran's hand.

An able defense lawyer might argue that given the brevity of Beltran's evasive actions in refusing to stop and to remove his hand from his pocket, the conduct failed to "substantially hinder" McClay. And we suppose a jury could agree depending on the full range of evidence at trial. But that isn't the issue here. The controlling issue is whether the facts would lead a reasonably prudent person to believe a crime had occurred, *i.e.*, was there probable cause to find Beltran had unlawfully obstructed McClay? On that point, we comfortably conclude the record evidence—McClay's uncontroverted description of his encounter with Beltran—is good enough.

So we find that an objectively reasonable officer standing where McClay stood would have had probable cause to arrest Beltran for obstruction in violation of K.S.A. 21-3808(a). See *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). Based on his testimony at the suppression hearing, McClay didn't size things up that way. He testified that in his opinion he hadn't seen Beltran commit a crime.

As Fourth Amendment law has developed, at least since *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), McClay's mistaken opinion is irrelevant. This court's legal analysis of the undisputed facts rests on two related considerations: how an objectively reasonable law enforcement officer would have treated those facts; and the effect that treatment of McClay's actions would have on Beltran's Fourth Amendment rights. See *Devenpeck*, 543 U.S. at 153; *Bond v. United States*, 529 U.S. 334, 338 n.2, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000); *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) (The Court points out that "the normal test" under the Fourth Amendment considers "whether probable cause existed to justify the stop."); *Terry*, 392 U.S. at 21-22 (In assessing the propriety of a search under the Fourth Amendment, a court must apply an objective standard to the facts, asking whether a police officer of "reasonable caution" would find the actions appropriate.). The Court has explained that "the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment." *Bond*, 529 U.S. at 338 n.2. What matters "is not [the officer's] state of mind, but the objective effect of his [or her] actions." 529 U.S. at 338 n.2.

The *Whren* Court addressed mixed-motive traffic stops, a somewhat different Fourth Amendment problem. There, detectives in plainclothes initiated a car stop for a minor traffic violation for which they had sufficient probable cause. But their real interest was to search the occupants and the vehicle for illegal drugs. The Court found no constitutional violation because the stop was based on genuine probable cause, although the officers had an ulterior objective. The *Whren* decision rests on the accepted proposition that an officer's subjective state of mind does not drive Fourth Amendment analysis—a proposition equally applicable here. *Whren*, 517 U.S. at 812-13. Accordingly, " '[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional.' " 517 U.S. at 813 (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 [1978]).

In *Devenpeck*, the Court repeated its often-stated articulation of the objective standard governing Fourth Amendment analysis:

" ' "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." ' " 543 U.S. at 153 (quoting *Whren,* 517 U.S. at 813. Applied here, the rule would effectively say that although McClay did not entertain the idea he had probable cause to arrest Beltran for obstruction and then to search his pocket as part of that arrest, the search was valid nonetheless because the circumstances actually justified such a search.

Although *Devenpeck* was a civil suit in which Alford sought damages on the grounds he had been unlawfully seized, liability turned on whether the officers violated the Fourth Amendment when they arrested him for what amounted to a nonexistent offense even though the facts, as accepted for purposes of review, established probable cause to arrest for unrelated crimes. The Court held there was no constitutional violation because "[o]ur cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." 543 U.S. at 153. Alford was arrested and charged with a criminal violation of Washington's antieavesdropping statute for tape recording part of his encounter with the officers—an interpretation of that law the state's appellate courts already had unequivocally rejected. A state court dismissed the charge against Alford, and he sued for damages. But the facts demonstrated probable cause that Alford had impersonated a law enforcement officer and had obstructed Devenpeck and his partner during their encounter. The Court found no Fourth Amendment violation although Alford had never been arrested or charged with impersonating an officer or with obstruction. 543 U.S. at 153. The Court held that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." 543 U.S. at 153.

The Court explained that a contrary rule would make the protections of the Fourth Amendment "arbitrarily variable," depending upon the ability of the arresting officer to identify the crime that fits the facts. 543 U.S. at 153-54. According to the Court, that

would tend to insulate the actions of a "veteran officer" who, based on his or her experience, would be better able than a rookie to identify or label the facts as supporting some "general class of offenses for which probable cause exists." 543 U.S. at 154. In turn, the Fourth Amendment might apply or not in essentially identical factual circumstances based only on an officer's ability to affix the proper label to those facts, a result the Court deemed unacceptable. See 543 U.S. at 154-56 (Court provides examples of such unacceptably differing outcomes drawn from facts of *Devenpeck*). In short, the "[s]ubjective intent of the arresting officer . . . is simply no basis for invalidating an arrest." 543 U.S. at 154-55. So "[t]hose are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." 543 U.S. at 155.

If, as *Devenpeck* recognizes, an arrest for a nonexistent crime may be salvaged for Fourth Amendment purposes because the facts support probable cause to arrest for an actual crime, then the same result should hold here, where McClay failed to recognize and label the crime of obstruction. And it follows that the search of Beltran doesn't turn into a Fourth Amendment violation because of McClay's subjective failure to identify or announce the basis for an arrest.

Indeed, the United States Supreme Court has consistently rejected a standard that would absolve law enforcement officers of Fourth Amendment violations when they subjectively believe in good faith, though quite mistakenly, the circumstances permit them to search or seize an individual. *United States v. Leon*, 468 U.S. 897, 918-20 & n.20, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (expressly reiterating subjective good faith to be inapplicable in Fourth Amendment analysis); *Terry*, 392 U.S. at 22; see *United States v. Perea-Rey*, 680 F.3d 1179 (9th Cir. 2012) ("[T]he Supreme Court has unequivocally disallowed reliance on the good faith or subjective beliefs of officers as part of the analysis of whether they violated the Fourth Amendment."). With a subjective standard, a court would be obligated to disregard a genuine constitutional violation because an officer held a good-faith belief he or she arrested and searched an individual with probable cause, no matter how unreasonable that conclusion might be. The Court's

objective test eliminates that possibility by removing the officer's subjective assessment of the facts and his or her intent from the determination of reasonableness for Fourth Amendment purposes. But an objective standard, measured by the hypothetical reasonable law enforcement officer, cuts the other way as well. So if the actual officer incorrectly, though in good faith, believes he or she lacks probable cause to arrest (and, thus, to search incident to that arrest), that mistaken opinion doesn't figure into a court's Fourth Amendment analysis. The court, rather, must turn to the objectively reasonable officer for analytical purposes. And if that officer would have understood there was probable cause to arrest and to constitutionally search the subject, the resulting evidence should not be suppressed.

Consistent with *Terry*, courts have regularly applied this principle in determining if the facts support a stop based on reasonable suspicion. That is, the court asks whether an objectively reasonable officer would have formed that degree of suspicion based on the facts and, therefore, would have stopped and questioned the individual. See *United States v. Barnett*, 505 F.3d 637, 639-40 (7th Cir. 2007) (citing *Devenpeck*, 543 U.S. at 153); *United States v. Lopez-Moreno*, 420 F.3d 420, 432 (5th Cir. 2005); *United States v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000); *United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991). The subjective reasoning of the officer making the stop is constitutionally beside the point. The *McKie* court well stated the analytical standard this way:

"The *Terry* standard being one of objective reasonableness, we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious. [Citations omitted.]" *McKie*, 951 F.2d at 402.

Probable cause to arrest is likewise judged using objective reasonableness and, therefore, is measured in that same way. The District of Columbia Circuit Court of Appeals so held in *United States v. Bookhardt*, 277 F.3d 558, 560 (D.C. Cir. 2002), finding "if a police officer arrests a defendant on a ground that later proves invalid, the arrest is nonetheless lawful if the same officer had probable cause to arrest the defendant for a different offense." In that case,

the appellate court found a search incident to an arrest to be constitutionally acceptable because the facts demonstrated probable cause for a reckless driving offense even though the driver's license violation on which the officer actually relied turned out to be a civil infraction rather than a crime.

Although decided on an inevitable discovery argument, the Kansas Supreme Court's opinion in *State v. Ingram*, 279 Kan. 745, 113 P.3d 228 (2005), lends substantial support both legally and factually to the same conclusion. A police officer stopped Ingram because he closely matched the description of a person wanted for a stabbing that happened earlier that morning. The officer then saw blood and other signs that Ingram had recently been in a fight. He instructed his back-up officer to handcuff Ingram and to check his pockets. The search of Ingram's pockets turned up crack cocaine. The officer told Ingram he was under arrest for possession of drugs. Ingram was initially charged with felony drug possession; some weeks later, the prosecutor added an aggravated battery charge related to the stabbing. Ingram filed a motion to suppress the drugs contending the officers lacked any constitutionally acceptable basis to search his pockets. The court held that the facts established probable cause to have arrested Ingram for aggravated battery. The court noted that circumstances must be viewed "from the standpoint of an objectively reasonable police officer." 279 Kan. at 752. And "whether the officers themselves believed they had probable cause is not determinative" of that issue. 279 Kan. at 752. On that basis, the court concluded that the drugs inevitably would have been discovered after Ingram had been taken to the law enforcement center where he would have been booked on the aggravated battery charge and then searched. 279 Kan. at 753. The court did not consider the search-incident-to-arrest exception to the warrant requirement as a ground rendering the actual search of Ingram proper, although that would have been entirely compatible with the objective test it outlined.

We mention an arguably contrary decision from this court. A Court of Appeals panel granted a motion to suppress in *State v. Schmitter*, 23 Kan. App. 2d 547, 554-55, 933 P.2d 762 (1997), in part, because the officer testified he searched Schmitter during a

traffic stop to find some form of identification, a constitutionally infirm justification. The officer had stopped the car, in which Schmitter was a passenger, for illegally turning without a proper signal. Neither Schmitter nor the driver wore a seat belt, a separate traffic offense. The officer testified that he would have issued a warning or a citation for the seat belt violation and decided to make an arrest only after the search turned up illegal drugs in Schmitter's pocket. The State argued that the seat belt violation was a general misdemeanor under K.S.A. 21-3105 and would have supported an arrest of Schmitter. The court declined to rule on that legal assertion, 23 Kan. App. 2d at 556, although it appears to be correct, and concluded the search could not be justified on that basis because "the officer had no intention of arresting Schmitter for failure to wear a seat belt." 23 Kan. App. 2d at 555. That aspect of *Schmitter* has been overtaken by more recent Fourth Amendment authority looking at what an objectively reasonable officer would do under the circumstances. See *Devenpeck*, 543 U.S. at 153. The United States Supreme Court has also since held that an officer's search incident to an arrest based on probable cause will be upheld as reasonable under the Fourth Amendment even if state law would not have authorized an arrest for the particular offense. *Virginia v. Moore*, 553 U.S. 164, 167, 176, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008) (search following arrest for driving with a suspended license based on probable cause comports with Fourth Amendment even though Virginia law required issuance of a summons for offense except in unusual and factually inapplicable circumstances); see *Atwater v. City of Lago Vista*, 532 U.S. 318, 323, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001) (no Fourth Amendment violation in arresting driver for failing to wear seat belt, even though offense punishable by only a fine under Texas law).

Applying the objective test here, McClay had probable cause to arrest Beltran for obstruction when Beltran refused the orders to stop and to take his hand out of his pocket—even though McClay didn't recognize the legal import of the situation. The facts measured objectively then supported McClay's action in reaching into Beltran's pocket as a constitutionally acceptable search incident to an arrest based on probable cause. In turn, the search did not

violate the Fourth Amendment, and the cocaine and money should be admissible.

The issue in the suppression hearing was whether Beltran's Fourth Amendment right to be free of an unreasonable search had been violated. Using an objective standard, there was no violation. To suppress the evidence in this case would neither recognize nor remedy a Fourth Amendment violation so much as punish the State for a law enforcement officer's shortsighted legal assessment of the circumstances leading up to the search. The Supreme Court has refused to endorse Fourth Amendment analyses that would apply those constitutional protections in irregular, if not capricious, ways dependent upon how the officers involved subjectively viewed the relevant events. See *Devenpeck*, 543 U.S. at 156 (protections of the Fourth Amendment would be intolerably "haphazard" if the result turned on which of two officers effected an arrest where they had differing suspicions about the proper charges); *Whren*, 517 U.S. at 814-15 ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent[,]" and to do otherwise would render the protections against unreasonable searches and seizures unacceptably "variable."). Had the Reno County Sheriff sent the "objectively reasonable deputy" along to help execute the search warrant, Beltran would be in exactly the same predicament he now finds himself. That deputy would have discerned probable cause to arrest Beltran for obstruction. He would have done so and then dutifully undertaken a full search of Beltran yielding the cocaine and money, all within the strictures of the Fourth Amendment. The outcome cannot and should not be any different because McClay was there without that assistance.

### What This Case Is Not About

The result also seems appropriate because Beltran had been lawfully seized or detained based on the *Summers* rule. The search itself did not extend the detention, since the officers were still looking for evidence in the house. So the search was not arguably tainted in some way because it piggybacked on an illegal seizure, a circumstance that would implicate fruit-of-the-poisonous-tree

concerns. See *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (traffic stop constitutes seizure under Fourth Amendment; evidence obtained during illegal traffic stop must be suppressed); *United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010) (citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 [1963]).

Under the objective standard, it doesn't really matter that Beltran was never formally arrested for or charged with obstruction, as *Devenpeck* recognizes. The United States Supreme Court's decision in *Knowles v. Iowa*, 525 U.S. 113, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998), does not point to a different result. In that short decision, the Court held that an Iowa statute allowing a law enforcement officer to search a motor vehicle if he or she issued a traffic citation to the driver violated the Fourth Amendment. In so ruling, the Court brushed aside the rationale of the Iowa Supreme Court that the officer had the statutory authority to make an arrest, rather than issue a citation, so the car could have been searched incident to an arrest. The Court never directly discussed that rationale but essentially recognized the Fourth Amendment does not permit a motor vehicle search incident to a traffic citation, since that situation fails to implicate officer safety or the need to preserve evidence to the same degree as an arrest would. 525 U.S. at 116-19. The circumstances here are not analogous. Unlike the Iowa motorist, Beltran was otherwise lawfully detained under the *Summers* rule and then engaged in conduct that not only amounted to a criminal offense but particularly implicated possible concealment of a weapon and, thus, heightened concerns about officer safety. The Iowa driver did nothing that would have amounted to probable cause to arrest him for any criminal offense. And we are concerned with a search of Beltran based on that probable cause to arrest, rather than a search of his car.

To the extent *Knowles* could be read to suggest the search-incident-to-arrest exception to the warrant requirement cannot apply in the absence of any arrest, the facts here are otherwise as well. See 3 LaFave, Search and Seizure § 5.4(a), p. 252 (5th ed. 2012) (*Knowles* "seems only to say" the exception "is inappropriate absent any contemporaneous arrest"). Beltran was arrested for pos-

session of the cocaine. The actual arrest, of course, was predicated on the search of his pocket and its illicit contents, rather than the other way around. But that doesn't negate the justifications for upholding a search when the objectively reasonable-officer test establishes independent probable cause to arrest before the search. Assuming there is some requirement for an actual arrest, those justifications should prevail even though the stated grounds for the arrest fail to stand up legally—a result consistent with *Devenpeck*, where the arrest was for a nonexistent crime, and with *Moore*, where the arrest was based on an infraction that mandated issuance of a citation. In *Bookhardt*, a case decided before *Devenpeck*, the District of Columbia Circuit held *Knowles* inapplicable precisely because a law enforcement officer made an arrest, although on grounds that later proved invalid. The court upheld the incident search because the facts established probable cause to arrest for another offense. *Bookhardt*, 277 F.3d at 566-67.

Neither is the Fourth Amendment so formulaic that the search must precede a formal arrest, if the two are roughly contemporaneous. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980); *United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006). A search will be upheld so long as "there [is] a legitimate basis for the arrest prior to the search." 470 F.3d at 997; see *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000) (search before arrest constitutionally acceptable if " 'a legitimate basis for the arrest existed before the search' " and " 'the arrest followed shortly after the search' ") (quoting *United States v. Anchondo*, 156 F.3d 1043, 1045 [10th Cir. 1998]). That the legitimate basis for the arrest may be different from the stated grounds is immaterial in light of *Devenpeck* and the objectively reasonable officer standard. 3 LaFave, Search and Seizure § 5.4(a), p. 252 ("[A] *Devenpeck*-style reliance on probable cause of another offense seems just as legitimate regarding a post-search arrest as it unquestionably is for a pre-search arrest.").

The legal sufficiency of the stated grounds for Beltran's arrest and the timing of that arrest impose no Fourth Amendment bar to the search and seizure in this case. What we have said doesn't resolve the (possible) *Knowles* corollary that a search may be con-

stitutionally unacceptable when no arrest for any offense has been made even if the facts establish objectively reasonable grounds for probable cause to arrest for some offense. That issue belongs to another case directly presenting it.

## Conclusion

The facts establish probable cause for a reasonable officer to have arrested Beltran for obstruction, rendering the search of his pocket constitutionally unobjectionable as an incident of arrest in conformity with the recognized exception to the warrant requirement of the Fourth Amendment. In the absence of a Fourth Amendment violation, the district court reached the correct result in denying Beltran's motion to suppress. The cocaine was properly admitted at trial, and Beltran was duly convicted.

Affirmed.

* * *

BUSER, J., concurring: I concur with the majority's affirmance of the district court's ruling upholding the legality of the warrantless search. I write separately, however, because I would hold that Deputy Shawn McClay had probable cause with exigent circumstances to search Isaac Beltran's pocket for cocaine or marijuana.

Deputy McClay was executing a search warrant issued by a judicial authority. Importantly, Beltran did not challenge the validity of the search warrant or the underlying affidavit in support of probable cause. (Inexplicably, neither the search warrant nor the affidavit was introduced into evidence.) Under K.S.A. 22-2502, we start with the understanding that the search warrant was issued by the judicial authority

"only upon the oral or written statement, . . . of any person under oath or affirmation which states facts *sufficient to show probable cause that a crime has been or is being committed* and which particularly describes a person, place or means of conveyance to be searched and things to be seized." (Emphasis added.)

At the time the search warrant was executed, Deputy McClay believed he was entering "a drug house" and he was looking to seize cocaine and marijuana. In short, the legal and factual context

which existed prior to McClay's entry into the residence is important: A judicial authority already had found probable cause to believe that a crime had been or was being committed and, as a result, Deputy McClay was directed to enter the residence and seize illegal drugs.

Deputy McClay was a member of the Sheriff Department's drug unit, with specialized training in the investigation of drug cases. His experience included participating in 15 to 20 searches of structures during the course of drug investigations. This deputy's unique knowledge and background is significant to the legal analysis.

" '[W]e view the officer's conduct, as must the district court, with "common sense" considering "ordinary human experience." ' [Citations omitted.]" *State v. Hardyway*, 264 Kan. 451, 459, 958 P.2d 618 (1998). " ' "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." ' [Citations omitted.]" 264 Kan. at 459. Thus, when "dealing with probable cause, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." *State v. Fewell*, 286 Kan. 370, Syl. ¶ 4, 184 P.3d 903 (2008).

Deputy McClay, "wearing a tactical vest that had Sheriff's Department written on it and a badge displayed" announced his presence at the door of the residence and stated that he had a search warrant. The deputy then knocked on the door for 20 seconds without any response from anyone inside or anyone opening the door to the residence. After this delay with no response, Deputy McClay then entered the residence, reannounced his presence, and repeated his purpose to execute the search warrant.

Upon entry, however, Deputy McClay discovered two persons in the front room, with Beltran only 7 to 8 feet from the door. Given the length of time the deputy had knocked on the door advising of his official purpose, and two persons inside the residence in proximity to hear the knocking and the deputy's statements, the fact that no one responded to the deputy or answered the door was certainly suspicious behavior. See *Illinois v. Wardlow*,

528 U.S. 119, 124-25, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (treating presence in area of criminal activity and evasive behaviors as pertinent factors).

Upon entry and confronting Beltran face to face, Deputy McClay ordered Beltran to "stop." Beltran, however, disobeyed the order and did not stop. Instead, Beltran "turned and walked, started walking towards the kitchen," and walked away from the deputy. As discussed by the majority, disobedience of a law enforcement officer's lawful order may be considered obstructing a law enforcement officer, in violation of K.S.A. 21-3808. Additionally, such disobedience resulting in apparent obstruction of a law enforcement officer may be a factor in the reasonable suspicion/probable cause calculus. See *State v. Pollman*, 286 Kan. 881, 891-92, 896-97, 190 P.3d 234 (2008).

When Beltran "turned and started walking away" from Deputy McClay, the deputy reasonably inferred that Beltran was attempting to flee with or dispose of evidence the court ordered him to seize. This was yet another important component to the deputy's probable cause determination. Moreover, it also presented a clear exigent circumstance that justified an immediate warrantless search. See *State v. Dugan*, 47 Kan. App. 2d 582, 605-06, 276 P.3d 819 (2012) (discussing exigent circumstances).

Moreover, Beltran's refusal to obey Deputy McClay's order to stop was only one of two orders Beltran disregarded. The district court found that "[Beltran] was told to stop, take his hand out of his pocket, and he did the exact opposite; he kept his hand in his pocket and moved away." This finding was undoubtedly based on Deputy McClay's testimony that Beltran "wouldn't listen to my commands, he wouldn't take his hand out of his pocket." Based on his experience in executing prior search warrants in drug cases, the deputy explained Beltran's persistence in keeping his hand in his pocket resulted in Deputy McClay's concern "for officer safety and also destroying evidence." Deputy McClay also explained the obvious—that based on his experience, small packages containing cocaine or marijuana can be placed in a front pocket.

In summary, considering the myriad of suspicious circumstances in their totality and employing the necessary common sense, I

would conclude that Deputy McClay possessed "specific facts leading a reasonable person to conclude evidence of a crime may be found in a particular place," in other words, a " 'fair probability' in light of the factual circumstances" that Beltran's pocket contained evidence of illegal drugs. See *State v. Lundquist*, 48 Kan. App. 2d 180, 185, 286 P.3d 232 (2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 [1983]).