NOT DESIGNATED FOR PUBLICATION

No. 114,764

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TERRY L. STANFORD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Harvey District Court; RICHARD B. WALKER, judge. Opinion filed April 28, 2017.
Affirmed.

*Charles A. O'Hara*, of O'Hara & O'Hara LLC, of Wichita, for appellant.

*David E. Yoder*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON and BRUNS, JJ.

BRUNS, J.:  Terry L. Stanford appeals from his convictions of conspiracy to manufacture methamphetamine and obstruction of legal process or official duty. He also appeals his sentence. Specifically, Stanford argues on appeal that the district court erred in denying his motions to suppress evidence found during the execution of two search warrants. In addition, he argues that the district court illegally sentenced him when it denied his motion for dispositional departure by journal entry following the sentencing hearing. We conclude that the district court did not err in denying Stanford's motions to suppress based on the circumstances presented. Moreover, we conclude that Stanford's sentence was not illegal. Thus, we affirm.

1

FACTS

On February 28, 2011, Detective Steve Catron with the Cass County, Missouri, Sheriff's Office called Senior Investigator James Sauerwein of the Harvey County Sheriff's Department to request assistance in locating a stolen Bobcat skid loader. The detective told Investigator Sauerwein that he had recovered an identification plate from a stolen Bobcat—with the number 509322586—during the execution of a search warrant at the home of Eric Decker in Cass County. Evidently, Decker admitted to Detective Catron that he had stolen a Bobcat skid loader from Whitewater, Kansas.

Decker also told Detective Catron that after stealing the Bobcat, he briefly took it to Missouri before giving it to Todd R. Redger, who lived in Hillsboro, Kansas. According to Detective Catron, Decker further told him that Redger had sold the stolen Bobcat to his uncle. Decker indicated that the uncle's name was Terry and that he lived in Harvey County. However, Decker said he did not know Terry's last name.

On March 1, 2011, Investigator Sauerwein called Marion County Undersheriff Dave Huntley—who was related to the Redger family—and asked him if Todd Redger had an uncle named Terry. Undersheriff Huntley stated that Redger's uncle was Terry Stanford and that he lived in the southwest part of Harvey County. Investigator Sauerwein knew who Terry Stanford was and knew where he lived.

The next day, Investigator Sauerwein called Detective Catron and they exchanged further information. In addition, Investigator Sauerwein called a Bobcat dealer in Wichita and learned that a Bobcat model 743B had been sold to Ag Service, Incorporated in Hillsboro in 1993. Investigator Sauerwein then called Ag Service and found out that a Bobcat skid loader had been stolen from the company's Whitewater branch in 2010. The Ag Service branch manager told Investigator Sauerwein that the identification or serial

number of the stolen Bobcat was 509322586, which was the same number on the identification plate found on Decker's property.

Moreover, Investigator Sauerwein confirmed with Detective Timothy Eldredge of the Butler County Sheriff's Office that the Whitewater branch of Ag Service had reported the stolen Bobcat. Detective Eldredge also verified that the model and serial numbers of the stolen Bobcat were the same as those Investigator Sauerwein had obtained during his investigation. After obtaining additional information, including a photograph of the stolen Bobcat, Investigator Sauerwein filed an application for a search warrant and supporting affidavit requesting to search Stanford's property and outbuildings for the stolen model 743B Bobcat skid loader. Judge Richard Walker found sufficient probable cause and issued a search warrant.

On the same day, Investigator Sauerwein, Detective Eldredge, and two other officers executed the search warrant. Upon arriving at the rural property, the officers saw a number of people outside. While Investigator Sauerwein spoke to Stanford, the other officers attempted to locate and identify who else was present on the property or in the outbuildings. Evidently, Stanford initially told Investigator Sauerwein that he had one Bobcat skid loader but that it was not stolen. Investigator Sauerwein then had Stanford take him to the Bobcat. According to Investigator Sauerwein, although the Bobcat Stanford showed him was the same model as the one reported stolen, it did not appear to be the same one depicted in a photograph of the skid loader. Specifically, Investigator Sauerwein indicated the bucket or scoop looked different.

Investigator Sauerwein then asked Stanford if he had any other Bobcats on the property. Stanford indicated that he had another Bobcat on the property, and he took Investigator Sauerwein to look at it. However, upon viewing the second Bobcat, Investigator Sauerwein noted that it was a model 543B rather than a model 743B. As

3

such, Investigator Sauerwein and Stanford started to return to the first Bobcat so that the officer could examine it closer in an attempt to locate a serial number.

While Investigator Sauerwein and Stanford were walking back to look at the first Bobcat, Detective Eldredge told them that he had seen a propane tank with bluish-green discoloration inside one of the barns. Detective Eldredge—who like Investigator Sauerwein is certified in the identification of clandestine methamphetamine labs—knew that anhydrous ammonia caused that type of corrosion he had observed. He also knew that anhydrous ammonia could be dangerous and that it was an active ingredient in the manufacture of methamphetamine. When informed of Detective Eldredge's discovery, Stanford began running toward the barn where the suspicious tank was found.

Even though the officers told him to stop, Stanford continued to run and went into the barn. As the officers chased him into what appeared to be a feed storage room, Stanford grabbed a container with liquid in it that Detective Eldredge believed to be a chemical used in the manufacture of methamphetamine. When instructed to show his hands, Stanford instead threw or dumped the liquid onto the ground in the barn. He also attempted to use a lighter to start a fire. At that point, the officers wrestled Stanford to the ground and placed him under arrest.

The officers secured the barn and sought a second search warrant. Specifically, the officers received a warrant to search for evidence of the manufacturing of methamphetamine as well as for items used in the manufacturing process. While executing this second search warrant, officers found several items suspected to be used in the production of methamphetamine. At some point, the officers also confirmed that the model 743b Bobcat located on Stanford's property was the one stolen from Ag Services and identified in the initial search warrant.

4

On March 4, 2011, the State charged Stanford with two counts of unlawful possession of ephedrine as well as one count each of manufacturing methamphetamine, possession of methamphetamine, theft, and possession of drug paraphernalia. On March 9, 2011, the State filed an amended complaint adding one count of sexual exploitation of a child based on a computer disc allegedly containing child pornography that was found on Stanford's property during the execution of a third search warrant.

On December 22, 2011, Stanford filed his first of three motions to suppress. He argued that the affidavit submitted in support of the initial search warrant was "totally based on hearsay." Specifically, Stanford maintained that the affidavit did not disclose Decker's criminal history or adequately explain the circumstances in which Decker had given Detective Catron information about the stolen Bobcat. Because Judge Walker had signed the search warrants in question, another district judge was assigned to hear the motions to suppress.

On March 29, 2012, the charges against Stanford were amended to one count each of manufacture of methamphetamine, unlawful possession of ephedrine, unlawful possession of lithium metal, possession of methamphetamine, possession of anhydrous ammonia in an unapproved container, theft, obstruction of legal process or official duty, and possession of drug paraphernalia.

On April 9, 2012, a hearing was held on Stanford's first motion to suppress. At the hearing, Investigator Sauerwein testified consistent with his statements in the affidavit in support of the first search warrant. In addition, he testified that he had two contacts with Decker around 2009 regarding an unrelated theft investigation but that no charges were brought as a result of that investigation. He also testified that he was not aware of Decker receiving any sort of benefit for giving law enforcement information about the stolen Bobcat.

5

Detective Catron testified that he arrested Decker in February 2011, after stolen property was found to be in his possession. After obtaining a search warrant and searching Decker's property, Detective Catron found—among other things—the identification tag from a Bobcat skid loader that he eventually discovered was stolen in Butler County. According to Detective Catron, Decker agreed to talk to him while he was in custody and did not ask for or receive any special consideration. Detective Catron also testified that Decker was unaware of any such offers from the Cass County prosecutor's office. Detective Catron testified that he probably told Decker that it was in his best interest to tell the truth in order to help himself.

After the presentation of the testimony, the district court granted a continuance to Stanford because the State had given documents to defense counsel on the day of the hearing. For whatever reason, the hearing was not reconvened until more than a year later. On April 26, 2013, Detective Catron testified that he told Decker that both he and his wife could be charged for the stolen items found on their property. As he was being returned to jail, Decker informed Detective Catron that he was willing to talk if his wife was kept out of it. Detective Catron testified that he told Decker that he "understood" but that he did not promise anything. In fact, the State of Missouri ended up filing charges against both Decker and his wife. It was during the interview that followed that Decker told him about the theft of the Bobcat in Kansas.

Ultimately, the district court denied Stanford's motion to suppress. In its letter decision, the district court relied on *State v. Landis*, 37 Kan. App. 2d 409, 156 P.3d 675 (2007), finding no presumption that Decker's statements to Detective Catron were reliable. Although the district court determined that the officers could have provided more information in the affidavit regarding Decker's criminal history and that they could have given more background information regarding the context of the interviews, the district court found that the officers had not deliberately omitted the information. Furthermore, the district court found:

"Even if the omissions complained of had been included in the affidavit, I am convinced there was sufficient information that had been independently verified by law enforcement that would lead a judge to approve a search warrant of the defendants' property. There are unique characteristics in this case which support this finding. How many Bobcats were stolen from Whitewater on that date with an ID plate found at the Decker residence in Missouri? How many Todd Redgers live in Hillsboro, Kansas, with an uncle Terry that lives in southwest Harvey County? There were enough details that did 'check out' to warrant the issuance of the search warrant even if Mr. Decker is both a liar and a thief."

On December 19, 2014, Stanford filed two additional motions to suppress. In one, he argued that during the execution of the first search warrant, the officers impermissibly continued to search his property after he had already shown them the Bobcat that was the subject of the warrant. In the other motion, Stanford argued that the first search warrant was overbroad. The district court found that the first warrant was not overbroad but held an evidentiary hearing on the issue of whether it was impermissible for the officers to continue the search of Stanford's property once he showed them the Bobcat that turned out to be the subject of the warrant.

At the hearing, Investigator Sauerwein testified that when the officers went to serve the initial search warrant, he told Stanford they were looking for a skid loader. Stanford said he had one and pointed in the direction of where it was sitting. Investigator Sauerwein further testified that he had a picture of the stolen Bobcat skid loader but the bucket on the one Stanford showed him looked different from the one in the picture. Before he went to take a closer look, Investigator Sauerwein asked Stanford if he had any other skid loaders on his property. Stanford said that he did, and they walked to where Investigator Sauerwein could see the second skid loader inside an outbuilding. He determined, however, that the second skid loader had a different model number than the one that was the subject of the search warrant.

7

Continuing, Investigator Sauerwein testified that he was trying to narrow down how many skid loaders Stanford had on his property "to find the right one." Investigator Sauerwein testified that he checked the serial number on the smaller skid loader, and it did not match. As an aside, he testified that that one was also reported stolen, but not in the case he was working on. He then asked Stanford if he had any more skid loaders, and Stanford said he did not. As Investigator Sauerwein and Stanford started to go back to the first skid loader, Detective Eldredge said they needed to stop because he had found the propane bottle with corrosion that he thought was part of the methamphetamine-making process. Inspector Sauerwein testified that he continued walking toward the first skid loader with Stanford because it was away from the potentially hazardous situation. Stanford asked if he could just bury the propane tank to get rid of it, and law enforcement told him that they could not let him do so. After this conversation, Investigator Sauerwein was able to check the first skid loader and determine that it was probably the one he was trying to find.

On cross-examination, Investigator Sauerwein testified that he had seen the model number 743B on the side of the first skid loader before he asked Stanford if he had any other skid loaders. On redirect examination, however, he testified that even though he had seen the model number on the first Bobcat, he was not sure that it was the specific one he was looking for. He explained that there were thousands of Bobcats with the same model number but that the identification number was different for each one. Unlike the model number that was in large print, one would have to look closely to find the identification number.

Detective Eldredge testified next. He indicated that the first thing he did upon entry onto Stanford's property was to conduct a safety sweep of the various outbuildings looking for people who may have been inside. As for his reason for the safety sweep, he testified that he was concerned "because there were so many buildings, and when we pulled up there were people standing in the driveway. We didn't know where they were

8

coming from." He then testified that as he was looking through the outbuildings, he saw the propane tank in the barn.

At the conclusion of the hearing, the district court denied the remaining motion to suppress. The district court determined that it was not unreasonable for Investigator Sauerwein to look at the second Bobcat before examining the first Bobcat more thoroughly. The district court also determined that Detective Elredge's cursory walk-through of the outbuildings was not unreasonable based on the circumstances. Ultimately, the district court concluded that the officers did nothing unreasonable or illegal in the execution of the first search warrant.

In denying the motion, the district judge found:

"[Investigator] Sauerwein did say that the 743B, this skid loader that he's first directed to by Mr. Stanford doesn't look quite right because of the bucket, or what have you, what I assume is a scoop.

"In the course of the conversation with the defendant, Mr. Stanford, he learns there's a second Bobcat. So, for whatever reason, instead of going to the first Bobcat, he goes to the second, and I don't know that it makes too much difference.

"I don't think it's unreasonable for [Investigator] Sauerwein at that point to look at the other skid loader. He discovers it's not a 743B, it's a 543B, and then that leads him to walk back towards the other to check it out further. That's the way I understood the situation. That he was going to go back and look at it further.

"Well, in the interim then we have the idea of the sweep, the protective sweep by Detective Eldredge and they discover this cylinder and [Investigator] Sauerwein actually walks up to the Bobcat No. 1, 743B. I think that just because [he] didn't immediately go to the first Bobcat in the area instead of the second one—I don't see that that was a violation of anything. So, [the officers are] lawfully there. There's two skid loaders to look at. He wants to see both of them and he doesn't discover, of course, until he walks to

the second one it's not a 743B, which it could have been, turned out it was a 543. There's nothing unreasonable about that."

Furthermore, the district court found:

"[Detective Eldredge] was not going through these buildings to search things. It was a pretty cursory walk-through. Was that reasonable under these circumstances? Sure it was. I think it was at least. Again, it was just a walk through, see if there's any other people standing around. They were in place, of course, with the suspicion that there was a stolen—some stolen property on the place. I don't think it's unreasonable for the other [detectives] there to walk through these outbuildings just to make sure there's nobody there. There's no evidence they were looking in the drawers or having some kind of detailed search.

"He's satisfied there's no other people there, but, of course, there's this cylinder. It sounds like [an] oxy acetylene tank as opposed to some small cylinder you have for your barbecue grill or something. But, nonetheless, the cylinder on plain sight [is] bluish on the fittings, which apparently . . . means that it held anhydrous ammonia, which is illegal in an unapproved container, et cetera.

"So, that information gets passed to Sauerwein while, of course, Mr. Stanford is standing there. At some point Mr. Stanford runs. Is he free to run? Well, I guess he's free to run, but, by the same token, it's certainly a suspicious act, especially in light of the fact they've just uncovered an illegal anhydrous container and I think . . . the police, were within their rights to tell him to stop and they were within their rights to follow him to the building and make sure he wasn't going to do something."

Subsequently, the parties agreed that the State would dismiss all of the charges except one count of conspiracy to manufacture methamphetamine and one count of obstruction of legal process or official duty. The parties also agreed that the case would be tried on stipulated facts and that the suppression issues would be preserved for appellate review. Accordingly, the district court held a bench trial on March 24, 2015,

10

and found Stanford guilty of conspiracy to manufacture methamphetamine and obstructing legal process or official duty.

On June 30, 2015, Stanford filed a motion for a downward dispositional departure. At the sentencing hearing held on July 1, 2015, the district court stated that it would announce the sentence but that it wanted to review the case law and to receive written submissions from the parties regarding the issue of whether a dispositional departure should be granted. The district court then announced that it was imposing a total sentence of 132 months of imprisonment and took the dispositional departure motion under advisement. Thereafter, on July 22, 2015, the district court filed a journal entry denying Stanford's motion for a downward dispositional departure.

ANALYSIS

*Omission of Information from Affidavit*

On appeal, Stanford contends that the district court erred by denying his motion to suppress the evidence found during the execution of the first search warrant. He argues that Investigator Sauerwein deliberately omitted pertinent information from the affidavit in support of the initial search warrant. He further argues that if the omitted information was included in the affidavit, the district court would not have found probable cause to issue the warrant. In response, the State contends that the omission of the information from the affidavit was neither deliberate nor material to the finding of probable cause.

The Fourth Amendment to the United States Constitution guarantees the right to be free from "unreasonable searches and seizures" and requires search warrants issued by courts to be supported by "probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Likewise, Section 15 of the Kansas Constitution Bill of Rights provides the same

11

protections. *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010). Moreover, K.S.A. 2016 Supp. 22-2502(a) states, in relevant part:

> "A search warrant shall be issued only upon the oral or written statement . . . of any person under oath or affirmation which *states facts sufficient to show probable cause that a crime has been*, is being or is about to be *committed and which particularly describes a* person, *place* or means of conveyance *to be searched and things to be seized*."

Generally, we presume that an affidavit supporting a search warrant is valid and accurate. See *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *State v. Adams*, 294 Kan. 171, 179, 273 P.3d 718 (2012). An exception exists, however, when a defendant alleges that the affiant deliberately or recklessly omitted a material fact. *Franks*, 438 U.S. at 171; *Adams*, 294 Kan. at 179. If a defendant alleges that material information was omitted from the affidavit, the district court must determine—by a preponderance of the evidence—whether the omitted information would have changed its decision to issue the search warrant. In particular, the district court must determine if there would still be probable cause to issue the warrant with the omissions added to the affidavit. *Franks*, 438 U.S. at 155-56. See also *State v. Schoonover*, 281 Kan. 453, 513, 133 P.3d 48 (2006).

Here, the district court held an evidentiary hearing and concluded that there was probable cause to issue the initial search warrant even considering the facts omitted from the affidavit. Accordingly, we must determine whether the affidavit provided a substantial basis for the issuing judge's determination that there is a fair probability that the evidence sought would be found in the place to be searched. This standard of review is inherently deferential and does not require that we determine, as a matter of law, that probable cause existed. *Adams*, 294 Kan. 171, Syl. ¶ 4; see also *State v. Mullen*, 304 Kan. 347, 353, 371 P.3d 905 (2016).

12

A review of the affidavit in support of the initial search warrant states that the information obtained from the Cass County Sheriff's Office regarding the stolen Bobcat was received from a person who was arrested for possession of stolen property and identified Decker as that person. The affidavit also indicated that Decker had been interviewed at the Cass County Sheriff's office. Furthermore, the affidavit indicated that stolen property had been recovered from Decker's property and that it was known that stolen property had been at his residence in the past.

Stanford argues that the affidavit should have also specifically stated that Decker was being held in custody on pending charges at the time he gave the information regarding the stolen property. Stanford also argues that the affidavit should have described Decker's lengthy criminal history and stated that Decker allegedly cooperated with the Cass County Sheriff's Office in an attempt to keep his wife from also being charged. Although the district court found that this information was omitted from the affidavit, it found that there was no evidence that it was deliberately omitted.

Regardless, we find that even if this information had been included in the affidavit, there still would have been probable cause to issue the search warrant. Decker is not a confidential informant but is specifically named in the affidavit. Moreover, the identification plate for the stolen Bobcat was found on Decker's property, and he admitted to stealing it in Whitewater, Kansas. As such, Decker would have no incentive to mislead law enforcement officers regarding its current location. Even if Decker is a known thief and hoped to help his wife by talking to the Detective Catron, most—if not all—of the information he gave regarding the stolen Bobcat was confirmed during Investigator Sauerwein's investigation. In fact, Decker did not provide a significant amount of the information regarding the theft of the Bobcat included in the affidavit in support of the search warrant.

In particular, Investigator Sauerwein was able to confirm that a Bobcat was indeed stolen from the location—and at the time—Decker had stated it was stolen. Decker told Detective Catron that he gave the skid loader to Todd Redger who sold it to an uncle named Terry in Harvey County. In turn, Investigator Sauerwein confirmed that Todd Redger had an uncle named Terry who lived in Harvey County. Therefore, we conclude that even if the omitted information had been included in the affidavit, it still would have provided a substantial basis for the issuing judge's determination that there was a fair probability that evidence of a crime would be found in the place to be searched.

*Reasonableness of Initial Search*

Stanford next contends that the law enforcement officers who executed the initial search warrant should have stopped searching once he pointed out a Bobcat that had the same model number as the one described in the warrant. Stanford maintains that by continuing to look for other Bobcats that may have been on his property, the officers impermissibly prolonged the termination of the search. In response, the State contends that it was reasonable for the officers to determine whether there were other Bobcats with the same model number located on Stanford's property before examining them closer to find identification numbers. The State also maintains that it was appropriate for the officers executing the search warrant to look in the various outbuildings located on Stanford's farm in order to ensure the officers' safety.

In reviewing a district court's decision on a motion to suppress, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. However, we have unlimited review of the district court's ultimate legal conclusion. See *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). Moreover, the State bears the burden to show that a search was lawful. *State v. Pettay*, 299 Kan. 763, 768, 326 P.3d 1039 (2014). "'If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant

14

exception from the warrant requirement, the subsequent seizure is unconstitutional without more.'" *Patterson*, 304 Kan. at 275 (quoting *Horton v. California*, 496 U.S. 128, 140, 110 S. Ct. 2301, 110 L. Ed. 2d 112 [1990]).

We interpret search warrants and their supporting affidavits in a common sense— rather than in a technical—manner. See *Patterson*, 304 Kan. at 275 (quoting *State v. LeFort*, 248 Kan. 332, 335-36, 806 P.2d 986 [1991]). The term "premises" in a search warrant includes "the whole of the property" where the item to be seized could be located. *Patterson*, 304 Kan. 272, Syl. ¶ 1. Accordingly, a lawful search of a premises "generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.'" *Patterson*, 304 Kan. 272, Syl. ¶ 2.

If "objectively reasonable indicia present at the time of the search" reveal that an area could contain the evidence identified in the search warrant, a search is authorized and the evidence found in such a place is lawfully discovered. *Patterson*, 304 Kan. at 280-81 (quoting *United States v Gottschalk*, 915 F.2d 1459, 1461 [10th Cir. 1990]). This test—which has been adopted by the Kansas Supreme Court as well as by this court— allows for alleged violations of the Fourth Amendment to be measured based on objective reasonableness so that comparable factual situations yield comparable constitutional outcomes. See *Florida v. Bostick*, 501 U.S. 429, 438, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); see also *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004); and *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). "The subjective intent of a law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment. What matters is not the officer's state of mind but the objective effect of his or her actions." *State v. Beltran*, 48 Kan. App. 2d 857, Syl. ¶ 11, 300 P.3d 92, *rev. denied* 298 Kan. 1204 (2013).

15

Like the district court, we are convinced from our review of the record on appeal that it was reasonable for the officers to look for any Bobcat skid loader located on Stanford's property that might have met the description in the search warrant. We also find that it was reasonable for the officers to look for the Bobcat anywhere on the property—including in the numerous outbuildings—where it could have been stored. In addition, we find that it was reasonable for the officers to locate any Bobcats that might have been present before attempting to find the identification or serial number on any particular one.

Although the first Bobcat that Stanford pointed out to the officers had the same model number as the one identified in the search warrant, there could have been multiple Bobcats with that model number located on the property. Unlike an identification or serial number, a model number does not pinpoint a specific piece of equipment. Moreover, Investigator Sauerwein compared the Bobcat that Stanford initially pointed out to a photograph of the stolen Bobcat and believed that the bucket or scoop looked different. Thus, we conclude that the objective effect of Investigator Sauerwein looking at another Bobcat located on the property before he returned to look for the identification or serial number on the first one Stanford pointed out was reasonable.

Additionally, Stanford argues that it was unlawful for Detective Eldredge to walk through the outbuildings while Investigator Sauerwein was looking for the stolen Bobcat. In response, the State argues that Detective Eldredge was performing a protective sweep for the purposes of officer safety while Investigator Sauerwein was speaking with Stanford. In particular, the State cites K.S.A. 22-2509 in support of a law enforcement officer's authority to detain individuals present during the execution of a search warrant for officer safety and to preserve evidence.

The record reflects that while Investigator Sauerwein was viewing the two Bobcats with Stanford, Detective Eldredge was performing what the district court

16

referred to as a "cursory walk-through" of the outbuildings to determine if any other people were there that could pose a possible safety threat to the officers. According to Detective Eldredge, he was concerned since there were a number of people standing around in the driveway when the law enforcement officers arrived to execute the search warrant. Because he "didn't know where they were coming from," Detective Eldredge believed it was appropriate to look through the buildings while Investigator Sauerwein attempted to locate the stolen Bobcat.

While he was walking through Stanford's barn, Detective Eldredge observed a propane container with a bluish-green corrosion on the valve that he believed—based on his training and experience in the identification of clandestine methamphetamine laboratories—to be evidence of anhydrous ammonia. As Inspector Sauerwein and Stanford were walking back toward the first Bobcat to take a closer look, Detective Eldredge stopped them and told them of the potentially hazardous situation in the barn. Stanford suggested that he could just bury the container but Inspector Sauerwein told him this was not an option.

Evidently, it was at this point that Stanford ran to the barn with the officers in pursuit. Once inside the barn, the officers observed Stanford grab a container that appeared to have liquid inside. Detective Eldredge noted a strong chemical odor and saw Stanford throw the container on the ground. When Stanford attempted to use a lighter, he was subdued by the officers and placed into custody. The officers then secured the barn and obtained another search warrant for methamphetamine and materials used in the production of methamphetamine. Upon executing the second search warrant, the officers seized evidence relating to methamphetamine manufacture as well as several items of stolen property.

The State describes Detective Eldredge's walk-through of the outbuildings on Stanford's property during the execution of the initial search warrant as a protective or

17

safety sweep. A cursory inspection of places where a person could be hiding was originally recognized by the United States Supreme Court—in connection with the service of an arrest warrant—in *Maryland v. Buie*, 494 U.S. 325, 332-33, 110 S .Ct. 1093, 108 L. Ed. 2d 276 (1990). "A protective sweep is a quick and limited search of premises incident to an arrest and conducted to protect the safety of police officers or others." *State v. Johnson*, 253 Kan. 356, Syl. ¶ 5, 856 P.2d 134 (1993); see *State v. Lemons*, 37 Kan. App. 2d 641, Syl. ¶ 5, 155 P.3d 732 (2007). Although Stanford recognizes in his brief that a protective or safety sweep of a premises is authorized during the execution of an arrest warrant, he maintains that there is no authority for a law enforcement officer to conduct a protective or safety sweep in connection with the execution of a search warrant.

In response, the State refers us to K.S.A. 22-2509, which authorizes officers to detain and search anyone on the premises to protect officers or others from attack or to prevent the destruction of evidence. In addition, the State cites several federal cases recognizing "that officers executing a search warrant may conduct a 'safety sweep' of the premises to verify no hidden dangers." *United States v. Dighera*, 2 F. Supp. 2d 1377, 1381 (D. Kan. 1998) (officers conducted a safety sweep of a residence with "protective garb and breathing apparatuses" when executing a search warrant); *United States v. Hernandez*, 137 F. App'x 169, 170 (10th Cir. 2005) (unpublished opinion) (while executing a search warrant, officers located a person in a bedroom "[w]hile conducting a safety sweep"); *United States v. Leeper*, No. 05-10250, 2006 WL 3457221, at *2 (D. Kan. 2006) (unpublished opinion) (officers executing a search warrant conducted "a quick 'safety sweep' to see if there were any potential hazards" before canine assisted in the search).

Although not cited by either party in their briefs, we find the case of *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013), to be persuasive on the issue of whether

18

law enforcement officers are also authorized to perform protective or safety sweeps when executing a search warrant. In *Starnes*, the Seventh Circuit found:

> "The philosophy behind a protective sweep, however, remains the same regardless of how the officers arrived in the home. When officers enter the residence of a criminal suspect and have reason to believe that a particular area might harbor an individual (or as in this case, an individual and an animal) who poses a danger to the officers or others, the Fourth Amendment permits a quick and limited protective sweep. As the Supreme Court reasoned, officers who are in a criminal suspect's home face the disadvantage of being on an adversary's turf and subject to ambush. Thus the constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search. [Citations omitted.]"

Similarly, the United States Court of Appeals for the First Circuit has approved the use of protective or safety sweeps in conjunction with execution of search warrants or when lawfully entering the property under exigent circumstances. As the First Circuit found, the analysis should not be based on whether the law enforcement officer was conducting an arrest but on whether the sweep was reasonable for officer safety. *United States v. Martins*, 413 F.3d 139, 149-50 (1st Cir. 2005); see also *Drohan v. Vaughn*, 176 F.3d 17, 22 (1st Cir. 1999) ("This circuit has held that when executing a search warrant, officers can perform a 'protective sweep' of an area if there is a reasonable suspicion of risk to the safety of the officers."). We agree.

Certainly, officer safety is a reasonable concern regardless of whether one is serving an arrest warrant or executing a search warrant. Unfortunately, both situations can be dangerous. See *State v. Cheever*, 304 Kan. 866, 375 P.3d 979 (2016) (sheriff shot and killed while attempting to serve an arrest warrant); *State v. Shively*, 268 Kan. 589, 999 P.2d 259 (2000) (police officer shot and killed while serving a search warrant). Furthermore, the Kansas Legislature has specifically recognized the importance of protecting officer safety during the execution of search warrants by the enactment K.S.A.

19

22-2509(a). Thus, although law enforcement officers do not have unadulterated authority to conduct protective sweeps, we conclude that officers are authorized to conduct limited sweeps of the premises to be searched if they articulate a reasonable belief that an individual may be present who poses a threat to safety during the execution of a search warrant.

Here, we find that Detective Eldredge articulated a reasonable belief that there could be individuals present who posed a threat to officer safety when he testified that "there were so many buildings, and when we pulled up there were people standing in the driveway. We didn't know where they were coming from." This testimony is bolstered by the Investigator Sauerwein's testimony that Detective Eldredge was "checking the other buildings to make sure we didn't have anybody come out and pose an officer safety threat at that time." The evidence in the record also supports the district court's finding that Detective Eldredge conducted a "cursory walk-through" of the outbuildings and was not looking anywhere other than places in which people could be hiding.

Finally, we note that although the State relies primarily on the validity of this search as a protective or safety sweep, the initial search warrant clearly allowed the officers to search any of the outbuildings on Stanford's property in which the stolen Bobcat may be located. As indicated above, the term "premises" in a search warrant includes "the whole of the property" where the item to be seized might be found. *Patterson*, 304 Kan. 272, Syl. ¶ 1. Accordingly, a lawful search of a premises "generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.'" *Patterson*, 304 Kan. 272, Syl. ¶ 2.The propane container was found after a quick inspection of the barn. A barn could certainly conceal a Bobcat. So regardless of whether this was a valid protective or safety sweep, it appears the search of the barn would have been justified by any of the officers present when the warrant was executed.

20

Applying the objective reasonableness test articulated in *Patterson*, 304 Kan. at 280-81, we find that it was reasonable under the circumstances presented for Detective Eldredge to walk through the outbuildings during the execution of the search warrant. As the district court found, the officers were lawfully on Stanford's property pursuant to a valid search warrant, which included the outbuildings and farm buildings where the stolen Bobcat might be located. In fact, Investigator Sauerwein testified that the second Bobcat he saw on Stanford's property was inside one of the outbuildings on the property.

We, therefore, conclude that under either the State's theory of a protective sweep or under the *Patterson* objective reasonableness test, the district court properly denied Stanford's motion to suppress all of the evidence seized from his property once he showed Investigator Sauerwein the Bobcat that turned out to be the subject of the warrant.

*Denial of Dispositional Departure by Journal Entry*

Finally, Stanford contends that his sentence is illegal because the district court denied his dispositional departure motion by journal entry after the sentencing hearing rather than in open court in his presence. Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which we have unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016). K.S.A. 22-3504(1) provides that an illegal sentence may be corrected at any time. See *State v. Fisher*, 304 Kan. 242, 263-64, 373 P.3d 781 (2016) (issue of illegal sentence may be raised for the first time on appeal).

Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which the appellate court has unlimited review. See *Lee*, 304 Kan. at 417. A sentence is illegal when it (1) is imposed by a court without jurisdiction; (2) does not conform to the applicable statutory provision, either in the character or the term of authorized punishment; or (3) is ambiguous with respect to the time and manner in which

21

it is to be served. *State v. Gray*, 303 Kan. 1011, 1014, 368 P.3d 1113 (2016). In the present appeal, Stanford does not specify which of these three he believes to apply. For this reason alone, Stanford's argument that his sentence is illegal fails.

A sentence is effective when pronounced from the bench. *State v. Tafoya*, 304 Kan. 663, 666, 372 P.3d 1247 (2016). In this case, the sentence pronounced from the bench conformed to the sentencing guidelines and, as such, was a legal sentence. See *Gray*, 303 Kan. at 1014. Had the motion for dispositional departure been granted, the sentence would have been the same but would have simply been suspended to probation. See *State v. Carr*, 274 Kan. 442, 451, 53 P.3d 843 (2002) (holding that probation is distinct from a sentence because it does not increase or decrease the sentence required to be imposed by statute and is a privilege rather than a constitutional right). Thus, even if the procedure the district court followed to deny the motion for dispositional departure was inappropriate, any error would be harmless because Stanford's sentence was pronounced in open court.

Affirmed.

* * *

ATCHESON, J., concurring in part and dissenting in part: The State has failed to show that law enforcement officers conducted a constitutional search of a barn at Defendant Terry L. Stanford's farm, and, in turn, the Harvey County District Court erred in denying Stanford's motion to suppress evidence of drug manufacturing they found there. Accordingly, I respectfully dissent from that part of the majority's opinion upholding the manner in which those officers executed a search warrant for a piece of construction equipment Stanford had purchased. I would reverse Stanford's conviction for conspiracy to manufacture methamphetamine and remand for further proceedings.

22

I do join in that part of the majority's opinion finding the application for the search warrant and the warrant itself to be legally sufficient. The purported omissions Stanford cites did not affect the constitutional efficacy of the warrant or the process leading to its issuance. How government agents executed the warrant at Stanford's residence is another matter.

The Fourth Amendment to the United States Constitution protects citizens from unreasonable government searches and seizures. Even if government agents have properly obtained a search warrant, they violate the Fourth Amendment by searching in an unreasonable way. A proper warrant necessarily identifies with particularity the place to be searched and the things that may be seized from that place. In conducting a constitutionally acceptable search, government agents may look only in those areas where the items might reasonably be found. So if all of the things identified in the warrant are bigger than a breadbox, the agents have no call to search breadboxes and would violate the Fourth Amendment if they did. See *State v. Schoonover*, 281 Kan. 453, 518, 133 P.3d 48 (2006); *United States v. Gamble*, 388 F.3d 74, 76-77 (2d Cir. 2004) ("The officers in this case had a Fourth Amendment justification for searching the contents of Gamble's drawer because they had a warrant authorizing them to search for and seize cocaine and drug paraphernalia—items that could plausibly be found in a dresser drawer.").

Here, the only thing identified in the warrant was described as a "Bobcat skid loader, model 743B" and the places to be searched were "land and outbuildings" at Stanford's "farmstead," with an accompanying street address in Harvey County. So the warrant on its face appears constitutionally satisfactory, if not beyond reproach.

The skid loader is hard to miss and certainly couldn't be kept in a breadbox. It is about 10 feet long, weighs just under 2 1/2 tons, and can be equipped with different attachments to perform various tasks on a work site, including excavating and loading. When the law enforcement officers went to the farm to look for the skid loader, they

23

understood Stanford had purchased it through an intermediary from the man who had stolen it. Nothing in the record indicates the officers believed Stanford to be dangerous or potentially violent. With the search warrant in hand, the officers were endeavoring to locate and recover a large piece of stolen equipment.

In addition to disputing the adequacy of the search warrant application, Stanford challenged the way the officers conducted the search. The issue focuses on whether Detective Timothy Eldredge conducted a constitutionally reasonable search of the barn where he discovered the discolored propane tank that alerted him to a possible methamphetamine lab. Having challenged the search of the barn, Stanford then cast upon the State the burden of proving the constitutional reasonableness of that search by a preponderance of the evidence. *State v. Beltran*, 48 Kan. App. 2d 857, 861, 300 P.3d 92, *rev. denied* 298 Kan. 1204 (2013).

The majority considers two arguments to support Eldredge's actions:  (1) He conducted a constitutionally proper "protective sweep" of the barn for persons who might pose a threat to the officers; and (2) he had a right to enter the barn under the auspices of the warrant to look for the skid loader. On this record, neither holds up. In the absence of some other justification for the search, the State has failed to satisfy its burden.

In the district court, the State relied on the protective sweep theory to prop up Eldredge's entry into and search of the barn. The district court denied Stanford's motion to suppress on that basis. We review using a bifurcated standard deferring to the district court's factual findings supported by substantial evidence and reserving unfettered consideration of the ultimate legal issue in light of those findings. *Beltran*, 48 Kan. App. 2d at 861. Here, there really was no conflicting evidence bearing on the point.

I agree that in certain case-specific circumstances, law enforcement officers may conduct a protective sweep when executing a search warrant. See *United States v.*

24

*Starnes*, 741 F.3d 804, 810 (7th Cir. 2013); *United States v. Beals*, 698 F.3d 248, 267 (6th Cir. 2012); *United States v. Daoust*, 916 F.2d 757, 758-59 (1st Cir. 1990). The concept simply adapts the "protective sweep" doctrine that has been applied to the execution of arrest warrants. *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990) (recognizing circumstances may permit protective sweep associated with arrest warrant consistent with Fourth Amendment). With either an arrest warrant or a search warrant, a protective sweep must be justified by "the specific and articulable facts" that lead the officer to believe the area "harbor[s] an individual posing a danger." *Buie*, 494 U.S. at 327 (arrest warrant); *Starnes*, 741 F.3d at 807-08 (search warrant, relying on *Buie*, 494 U.S. at 327). The grounds for a constitutionally acceptable protective sweep essentially replicate those for a pat-down frisk during an investigatory *Terry* stop—particularized circumstances suggesting someone is armed or otherwise poses a threat. *Buie*, 494 U.S. at 331-34; see *Terry v. Ohio*, 392 U.S. 1, 26-27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Here, the evidence shows Eldredge undertook a protective sweep as a matter of standard procedure rather than based on specific circumstances suggesting some threat to the officers. In its brief, the State says Investigator James Sauerwein, who coordinated the search, ordered a protective sweep of the outbuildings "[f]ollowing standard law enforcement practice." But standard practices or procedures cannot substitute for case-specific facts to render a search reasonable under the Fourth Amendment. See *State v. White*, 44 Kan. App. 2d 960, 971, 241 P.3d 591 (2010) (officer's routine practice cannot justify frisk during *Terry* stop); *United States v. Taylor*, 666 F.3d 406, 409 (6th Cir. 2012) (police cannot justify protective sweep during arrest "simply by citing their standard procedure"); *United States v. Hunt*, 253 F.3d 227, 234 (5th Cir. 2001). So that justification fails.

There were no specific facts that would justify a protective sweep of the buildings on Stanford's farm. The officers did see an unspecified number of people in the driveway

25

area when they arrived. But that, in and of itself, is not an imminently dangerous situation. The officers certainly could detain those persons to keep them from interfering with the execution of the search warrant. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). And if the officers had particularized reasons to believe any of those persons were armed, they could pat the individual down for weapons. *Ybarra v. Illinois*, 444 U.S. 85, 92-93, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979); *Beltran*, 48 Kan. App. 2d at 863. The nature of search itself suggested no particular danger, rather, just the opposite. As I have indicated, the officers were attempting to locate and recover a piece of stolen equipment Stanford had purchased. Nothing in the record indicated the officers believed Stanford to be involved in some ongoing criminal enterprise or to have a history of criminal activity. This was not a raid on the hideout of a gang of armed robbers or the seizure of a cache of firearms or explosives—law enforcement expeditions that by their specific circumstance would suggest a protective sweep might be appropriate. If the facts here justify a protective sweep, as the majority holds, it is hard to envision a situation in which a sweep would be impermissible.[1]

[1] The majority's observation that the execution of warrants can sometimes be dangerous fails to advance a constitutional justification for a protective sweep in *this* case. Law enforcement officers regularly find themselves in perilous situations. Their profession—unlike virtually any other—necessarily carries with it the predictable potential for violent, life-threatening encounters. But the inherently risky nature of the work does not obviate the constitutional requirement for particularized factual bases to search a person for weapons or to conduct a protective sweep of a place.

Likewise, the majority's reliance on K.S.A. 22-2509, codifying grounds for detaining and searching anyone during the execution of a search warrant, adds nothing to the controlling constitutional analysis. The legislature may not dilute constitutional protections. So if K.S.A. 22-2509 were to expand the purported authority of law enforcement officers to act beyond what is permitted in the Fourth Amendment and, thus, to conduct constitutionally unreasonable searches, it would be unenforceable. See *State v. James*, 301 Kan. 898, 904-05, 349 P.3d 457 (2015).

The majority offers a second basis justifying Eldredge's entry into the barn, leading to his discovery of the suspicious tank:  He had a right to do so in searching for

the skid loader identified in the warrant. The evidentiary record fails to factually support the justification. The State did not advance that theory in the district court and, as a result, did not tailor its evidentiary presentation to promote it. So the gaps in the evidence undo the theoretical argument. The evidence shows Eldredge *intended* to conduct a protective sweep rather than to search for the skid loader. But, as the majority correctly points out, an officer's subjective intent or state of mind is irrelevant if his or her actions are consistent with a reasonable search conforming to the Fourth Amendment. Here, at the point Eldredge approached the barn, the officers were still properly searching the premises identified in the warrant to locate the listed skid loader. They had already found two skid loaders and had yet to determine that either was the one in the warrant. So they were entitled to keep looking.[2]

[2] I don't buy Stanford's argument that the officers acted in a constitutionally unreasonable way in examining the two skid loaders. They necessarily had to closely examine one before the other and, for no particularly apparent reason, picked the one not listed in the warrant. After determining as much, they promptly examined the other and verified it to be the object of their search. In the meantime, Eldredge had discovered the tank in the barn. Stanford contends the officers should have examined the skid loaders in the reverse order because the visible model number of the second one they looked at matched the model number given in the warrant. Stanford says the search was impermissibly prolonged as a result. The Fourth Amendment does not permit government agents to needlessly extend the duration of a search or seizure. See *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609, 1612, 191 L. Ed. 2d 492 (2015). By the same token, however, it mandates no strict protocol as to how those agents must serially examine objects potentially within the scope of the warrant, so long as the process satisfies the general requirement of constitutional reasonableness. *Dalia v. United States*, 441 U.S. 238, 257, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979); *Johnson v. Manitowoc County*, 635 F.3d 331, 335 (7th Cir. 2011). Here, the record demonstrates neither an inordinate delay nor a subterfuge to extend the search for some impermissible purpose.

From Eldredge's testimony at the suppression hearing and the balance of the record, we know nothing about the barn, the propane tank, or where the tank was discovered. I am prepared to assume the barn could have housed a skid loader, although even that isn't obvious from the evidence. That is, I presume a typical "barn" would have a doorway through which a skid loader would fit, and I will indulge that presumption

here. We have no idea about the configuration of the barn. Eldredge may have been able to tell whether there was a skid loader in the barn as he stood at the threshold of the entrance—especially given the size of a skid loader. He would not, then, have been justified in venturing into the barn if there were no skid loader. We don't know if Eldredge could have seen the propane tank from that vantage point or if he discovered it after going well into the barn as part of his impermissible protective sweep. In short, the State failed to show that Eldredge would have found the propane tank before he reasonably determined the barn did not contain a skid loader. The majority's alternative basis for upholding the discovery of the tank requires precisely that factual showing. As a result, I find no grounds rendering the search of the barn and the discovery of the propane tank constitutionally reasonable under the Fourth Amendment. I, therefore, would reverse the district court's ruling denying Stanford's motion to suppress.[3]

[3] I offer no opinion on the propriety of the district court's ruling on and denial of Stanford's motion for a departure sentence by written order rather than during the sentencing hearing. Stanford has failed to identify any actual prejudice because the ruling was not announced in his presence in open court, so any error would be harmless.