# COURT OF APPEALS OF VIRGINIA

**Record No. 0015-26-1**

COMMONWEALTH OF VIRGINIA

v.

MICAYA LEE WILLIAMS

Present: Judges O'Brien, Athey and White

Argued by videoconference

Opinion Issued June 2, 2026[*]

---

**FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH**
Scott Joseph Flax, Judge

John A. Fisher, Assistant Attorney General (Jay Jones, Attorney General, on briefs), for appellant.

(Robert W. Williams, Jr., Assistant Public Defender, on brief), for appellee. Appellee submitting on brief.

---

**MEMORANDUM OPINION BY**
**JUDGE KIMBERLEY SLAYTON WHITE**

The Circuit Court of the City of Virginia Beach ("trial court") granted Micaya Lee Williams's ("Williams") motion to suppress evidence that he had a firearm in a bag he was wearing during a traffic stop. The Commonwealth argues that the trial court erred because the officer who frisked Williams's crossbody bag had reasonable suspicion that Williams had a firearm in the bag. In the alternative, the Commonwealth asserts that the firearm would have been inevitably discovered by another officer at the scene who would have frisked the bag. Finding error, we reverse.[1]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] As we resolve this case on the first allegation of error raised by the Commonwealth, we do not address inevitable discovery argument.

## I. BACKGROUND

On the night of April 15, 2025, Williams was pulled over in Virginia Beach by law enforcement while driving a BMW with fictitious tags.[2] Virginia Beach Police Officer Wilson E. Chaplain conducted the traffic stop, later assisted by Detective D.R. Small. During the course of the traffic stop, Detective Small removed a handgun from a bag Williams was wearing across his body while Officer Chaplain detained Williams against the exterior of the BMW. A grand jury subsequently indicted Williams with unlawfully carrying a concealed weapon, second offense, in violation of Code § 18.2-308 and with possession of a firearm by a person convicted of a felony within the past ten years, in violation of Code § 18.2-308.2.[3]

Williams moved to suppress all evidence recovered from the traffic stop because, he argued, the officers "illegally seized and searched" him in violation of the Fourth Amendment of the United States Constitution. Williams specifically asserted that officers could not "remove . . . [him] from his vehicle and search him for weapons because [they] did not have reasonable and articulable suspicion to believe . . . Williams was armed and dangerous."[4] The Commonwealth countered that officers had specific and articulable suspicion that Williams had a

---

[2] The tags were registered to a vehicle of different make and color and had expired over a year before the traffic stop.

[3] Williams was also charged on a misdemeanor warrant for displaying fictitious tags. Pursuant to Code § 19.2-398(A), the Court will review the appeal only insofar as it pertains to the felony indictments.

[4] Although the written motion to suppress asserted that the officers could not remove Williams from the vehicle, that position was not addressed at the motion to suppress hearing. Counsel for Williams stated to the trial court, "Our issue comes as to whether or not they had reasonable articulable suspicion to do the pat down to get everything out." Furthermore, in the brief before this Court, that position was not addressed. "The issue in dispute, is that [the detectives] did not have the legal authority to search the cross-body bag once it was removed from the defendant's person." We, therefore, do not address whether the officers could remove Williams from the vehicle.

firearm in his crossbody bag, permitting them to frisk the bag and subsequently seize the weapon. The circuit court heard evidence and argument on the motion at a pre-trial hearing.

At the hearing, the Commonwealth called Officer Chaplain, who testified that he conducted the nighttime traffic stop because Williams's vehicle displayed "fictitious tags." Officer Chaplain advised that he "immediately t[old] [Williams] the basis of the traffic stop" and asked for his license and registration. He testified that Williams was wearing a crossbody bag that was "tight against his neck" and had a phone in his hands.

Officer Chaplain then testified that when he asked Williams for his license and registration, Williams "leaned forward more towards like the center console dash area," which "caused his crossbody bag that was near like his appendix area . . . to fall down . . . against the left part of his body." Officer Chaplain explained that something in the bag was "heavy" and that "[i]t appeared the bag was anchored" to Williams's body.

Officer Chaplain further testified that at that moment, he observed "some sort of imprint, like a large-framed imprint." He clarified that the imprint was "rectangular" and not wide enough to be a screen from a cell phone but also not thin enough to be the edge of one. He testified that it was "possibly a slide" but averred, "I could not, I guess, like specifically tell you exactly what firearm would be in there, but it appeared that it was like a large object, potentially a handgun, inside the bag." He explained that what he saw he believed could possibly be the top of the slide of a gun and stated further that "it was definitely not a phone" nor a set of keys or a wallet. Officer Chaplain said that it "certainly was more than likely a firearm [in the crossbody bag], from my previous experience of seeing guns printing through crossbody bags." He explained that "I have pretty frequently during the course of my job with the police department run across firearms within crossbody bags."

Officer Chaplain stated that he "almost immediately" asked Williams if he had a gun in his bag. Williams denied having a firearm. Officer Chaplain stated that while Williams was being cooperative "[f]or the most part," he began exhibiting "furtive behavior," clarifying that Williams "was kind of apprehensive like when we were asking him questions in reference to like the firearm. He just seemed kind of nervous."

Officer Chaplain recalled ordering Williams to "step out of the vehicle to conduct a weapons frisk." He testified that Williams "didn't get out of the vehicle" so he and Detective Small—who had just arrived at the scene—had to "kind of get him pulled out." He further testified that officers took Williams's phone out of his hands, "detain[ed] him against the side of the vehicle," and put him in handcuffs. Officer Chaplain then recalled that Detective Small conducted a weapons frisk and located a handgun inside Williams's cross-body bag. Officer Chaplain affirmed, however, that "if Detective Small had not been there," he "would have frisked [the bag] . . . personally."

Officer Chaplain also testified to his experience as a member of the "Crime Suppression Squad," which he explained "investigate[s] gangs, guns, and violent crime." He noted that he was "a firearms instructor for the Virginia Beach Police Department's Training Unit," indicating that he was "pretty familiar being around firearms and how they're carried." He also explained that "[he] ha[d], in [his] experience, run across handguns in similar bags."

Detective Small testified that he arrived on the scene when Officer Chaplain ordered Williams to get out of the vehicle. Detective Small stated that Williams was refusing to get out of the vehicle. After he assisted Officer Chaplain in removing Williams from the vehicle, Detective Small noticed that Williams had a black crossbody bag that "appeared to be heavy" due to "some heavy object inside it." He detained Williams against the BMW's exterior with Officer Chaplain. He explained, "Once we placed [Williams] against the vehicle, I could hear a

heavy object hit the side of the patrol vehicle from inside the bag," further describing it as a "thud sound." Detective Small testified that he "grabbed the bag to take the bag off of . . . Williams while he was being placed into handcuffs" and "[a]t that time [Detective Small] immediately felt a heavy metallic object, based on [his] training, knowledge, and experience, [he] believed to be a firearm."[5] He said that it was not consistent with a phone or a wallet. Detective Small testified that "he advised [Officer] Chaplain that [he] believed there was a firearm inside the [bag]." He subsequently retrieved it after Officer Chaplain asked him to do so.

Detective Small also testified that he was removing the crossbody bag from Williams "just for safety reasons," noting that detainees are "not allowed to have like backpacks or bags on them while they're being handcuffed." Detective Small explained that this procedure was "usual practice" and stated that simply removing the bag from the body of Williams was "his intention with th[e] bag prior to hearing this thud of the bag hitting the car."

At this point, the Commonwealth rested,[6] and the trial court heard argument on the matter. Williams did not dispute the lawfulness of the traffic stop but contended that Officer Chaplain and Detective Small were not justified in frisking his bag because they did not have reasonable suspicion that he was armed and dangerous.[7] The Commonwealth countered that the officers' experience in the Crime Suppression Squad, in addition to the usual practice of removing bags from suspects being detained, led Detective Small to identify specific, articulable

---

[5] Detective Small had significant experience with firearms. He had received specialized training in firearms, had numerous years of experience in the detection of firearms, and had made many arrests for firearms violations.

[6] Throughout their testimony, the Commonwealth presented Officer Chaplain's and Detective Small's body-worn footage to the trial court. However, the Commonwealth did not seek to introduce the footage into evidence.

[7] Williams also did not dispute his removal from the vehicle by the officers nor his cuffing nor detention.

facts that Williams had a handgun in the bag. Additionally, the Commonwealth asserted that even if Detective Small could not frisk the bag, Officer Chaplain would have inevitably discovered it when he, pursuant to his own reasonable suspicion, would have patted down the bag.

After taking the matter under advisement, the trial court later granted Williams's motion to suppress. The trial court articulated that Williams violated "a relatively minor traffic offense" that "on its own does not indicate [Williams] may be armed and dangerous." The trial court also highlighted that Officer Chaplain testified that "there was nothing in particular about the BMW or [Williams] that led [Officer Chaplain] to stop him," and "the detectives knew nothing of [Williams's] criminal history." The trial court noted that "[i]n this case, . . . the two main factors that we have is the apparent weight of the bag and the thud of the bag as it hits the police car." These observations, to the trial court, "might amount to a hunch or a belief but don't raise to the level of the reasonable articulable suspicion that [Williams] is armed and dangerous."

The trial court also dismissed Officer Chaplain's testimony about the imprint, noting that his testimony indicates the imprint was "a rectangular shape" and not more specific. The trial court specifically opined that "the [c]ourt could find just as easily" that the imprint "could be a cell phone or a wallet or something to that nature." The trial court also relied on the fact that Officer Chaplain "only looked at it for a brief moment," indicating a "lack of investigation" on the officers' part. The trial court continued, "[A]nyone can have those crossbody bags. I understand that the officers testified . . . that they had a lot of encounters with people with crossbody bags, but . . . you see them everywhere. They sell them in all sorts of stores."

The trial court concluded, "[I]f we don't get to the pat down and the frisk, then we don't get to inevitable discovery and we don't get to the collective knowledge or anything to that

nature." The trial court then entered an order consistent with its ruling. The Commonwealth appeals.

## II. ANALYSIS

### A. *Standard of Review*

When assessing the lawfulness of a search under the Fourth Amendment, this Court must "independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements." *Baskerville v. Commonwealth*, 76 Va. App. 673, 684 (2023) (quoting *Shiflett v. Commonwealth*, 47 Va. App. 141, 145-46 (2005)). However, we defer to the trial court's factual findings, reviewing them "only for clear error" and "giv[ing] due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* (quoting *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021)).

### B. *Detective Small lawfully frisked Williams's bag.*

The Commonwealth contends that Detective Small had reasonable suspicion that Williams had a firearm in his crossbody bag. We agree.

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, this requires that law enforcement obtain search warrants, detailing the place or property to be searched, to conduct a lawful search. *See, e.g.*, *Katz v. United States*, 389 U.S. 347 (1967). Those warrants are issued after law enforcement shows probable cause to justify the search. *See* U.S. Const. amend IV (including the Warrant Clause).

There are several "specifically established and well-delineated exceptions," however that permit law enforcement to conduct a search without a warrant. *Katz*, 389 U.S. at 357. Some of these include warrantless searches incident to a lawful arrest, *see, e.g.*, *Chimel v. California*, 395

U.S. 752, 762-63 (1969), and when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable," *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)).

Another situation where police officers do not need a warrant to intrude into a person's privacy interests is during investigative stops. *See Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). While "not retreat[ing]" from precedent mandating that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure," investigative stops implicate "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Id.* at 20. The lawfulness of investigatory stops "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.* This general proscription, at bottom, is a balancing test between "the need to search [or seize] against the invasion which the search [or seizure] entails." *Id.* at 21 (alterations in original) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 537 (1967)).

In *Terry*, the Supreme Court of the United States fashioned a two-step test to effectuate this balance for investigatory stops. *See Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). "First, the investigatory stop must be lawful," meaning that a "police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense." *Id.* at 326; *see Terry*, 392 U.S. at 30 (noting that this condition is satisfied when "a police officer observes unusual conduct [that] leads him reasonably to conclude in light of his experience that criminal activity may be afoot"). The suspect must not be able to freely leave the officer's presence for this first step to be satisfied. *See* 2 Wayne R. LaFave, *Search and Seizure* § 3.8(d) (4th ed. 2025) (articulating that, by logical necessity, "the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop" (quoting *Terry*, 392 U.S. at 32 (Harlan, J.,

- 8 -

concurring)); *cf. Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). "[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Johnson*, 555 U.S. at 327.

"Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Id.* at 326-27. This suspicion must be supported by "specific and articulable facts" in combination with any "reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 21, 27. "[U]nparticularized suspicion[s]" or "inarticulate hunches" are not sufficient, nor is an officer's "subjective good faith." *Id.* at 21-22, 27. Rather, the officer's suspicion is measured against an "objective standard": "whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 21, 27. And "[i]f a person is armed, they are presumptively dangerous, even if their possession of a firearm is legal." 5 Ronald J. Bacigal & Corinna Barrett Lain, *Virginia Practice Criminal Procedure* § 3:4 (2025-2026 ed.) (citing *Williams v. Commonwealth*, 71 Va. App. 462 (2020)).

Courts determine whether officers have reasonable suspicion that a suspect is armed by reviewing "the whole picture," meaning the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981). In addition, "[i]n developing . . . reasonable suspicion, [an officer] [i]s entitled to rely on information communicated to him by his fellow law enforcement officers." *Reed v. Commonwealth*, 36 Va. App. 260, 266 (2001). But knowledge is not imputed to a frisking officer when it is not communicated to them in some way. *McArthur v. Commonwealth*, 72 Va. App. 352, 365 (2020) (holding that the "'horizontal' aggregation[] of

knowledge" is not imputed onto officers when they are not provided that information from others).

These principles also apply to a suspect's possessions, but some additional complications arise in these circumstances. When officers have reasonable suspicion that a person is armed, officers are able to frisk both the person and their personal effects, such as a jacket they are wearing. *See, e.g.*, *Terry*, 392 U.S. at 30. The Supreme Court also held that, in the context of traffic stops, officers may "search of the passenger compartment of an automobile," so long as the officers have reasonable suspicion that the suspect is armed and the search is "limited to those areas in which a weapon may be placed or hidden." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). This Court has tacitly extended this logic beyond the traffic-stop context, permitting officers to frisk a suspect's backpack if they had reasonable suspicion that the suspect was armed. *Washington v. Commonwealth*, ___ Va. App. ___, ___ (Apr. 14, 2026).[8]

However, when officers seek to detain and frisk other personal property, officers must have "observations [that] lead [them] reasonably to believe that" the property—as opposed to the person—"contains narcotics [or weapons]." *United States v. Place*, 462 U.S. 696, 706 (1983). This permits officers, for example, to briefly detain a traveler's luggage and subject it to the sniff of a drug dog when the officers had "specific articulable facts that *the property* contain[ed] contraband or evidence of a crime." *Id.* at 706 (emphasis added); *cf.* 2 John Wesley Hall, *Search and Seizure* § 21.31 (6th ed. 2025) ("An officer has the right to frisk a detainee's possessions under *Terry* if there is a reasonable suspicion that a weapon may be located there.").

---

[8] The challenge in *Washington* was limited to whether officers could frisk the bag while the suspect was detained. This Court in *Washington* specifically noted that the appellant "d[id] not contest that a backpack can be part of a person's outer clothing and therefore included in a limited search for weapons under *Terry*." *Washington*, ___ Va. App. at ___.

- 10 -

These rules blend together when a suspect is wearing or holding an item of personal property—such as a purse, backpack, or briefcase—when officers have reasonable suspicion that the person is armed. *See* 2 LaFave, *supra*, § 3.8(e). This Court has rejected the argument that *Terry* only permits frisks of outer clothing, noting that "Supreme Court, lower federal court, and state court cases since *Terry* have extended the scope of a frisk beyond the suspect's outer clothing." *Servis v. Commonwealth*, 6 Va. App. 507, 516-17 (1988) (collecting cases).

If both steps under *Terry* are satisfied, police officers may conduct limited "intrusion[s] upon cherished personal security" that are "strictly circumscribed by the exigencies which justify its initiation." *Terry*, 392 U.S. at 25, 26. The intrusion "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion." *Id.* at 26. At the same time, the Court "ha[s] not required that officers adopt alternative means to ensure their safety in order to avoid" a "legitimate *Terry*-type intrusion." *Long*, 463 U.S. at 1052 & n.16.

The Supreme Court's application of these principles bears this out. In *Terry*, officers were permitted to pat down the suspect while he was wearing a jacket. *See* 392 U.S. at 28. For closed containers, meanwhile, the Supreme Court has applied this standard to allow officers to either open closed containers found in vehicle's passenger compartment during the course of a *Terry* stop, *see Long*, 463 U.S. at 1049, or subject closed luggage to a drug dog that sniffed for the odor of narcotics, *see Place*, 462 U.S. at 706-07. Regardless, the only way officers may ultimately seize the weapons or contraband while performing the *Terry* intrusion (i.e., frisk)— without subsequently obtaining a warrant—is when it is "immediately apparent" upon perceiving the object that the object is a weapon or contraband. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Here, we hold that the officer who frisked Williams's crossbody bag—Detective Small—had reasonable suspicion that Williams possessed a firearm in his bag under the totality of circumstances that were available to him and based upon his extensive training and experience in firearms detection and arrests. Detective Small observed something "heavy" within the bag, which his experience indicated could have been a firearm. He also knew that Williams was not complying with Officer Chaplain's order to get out of the car, which is another factor supporting Detective Small's reasonable suspicion.

True, Detective Small did indicate that "[t]here was nothing in particular about [Williams's] bag or anything at that moment before [he] touched it." But that does not mean his ultimate frisk of the bag was not supported by reasonable suspicion. He still made specific observations on his way to touching the bag that indicated that Williams was armed. And this is all that *Terry* requires. Accordingly, notwithstanding Detective Small's statements that he would have taken the bag off Williams no matter his observations, he still had reasonable suspicion supporting his decision to frisk the bag.

Nor does the fact that Detective Small acted pursuant to a "usual practice" vitiate this conclusion or undermine the purposes of *Terry*. While officers must satisfy the objective standard set out in *Terry*, they are also meant to do what is deemed necessary to be safe in the course of their job. The Supreme Court has recognized this officer-safety rationale as the critical underpinning of the rules governing *Terry* stops and frisks. Indeed, the Court itself has recognized that traffic stops are particularly dangerous for officers, noting that a number of officer deaths have occurred during the course of traffic stops. *See Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977). Detective Small, with the knowledge that he previously encountered firearms in cross-body bags, arrived on the scene knowing full well this circumstance could turn dangerous quickly. As such, he went to remove the bag from Williams's body while he was

- 12 -

being detained, as he usually did.  This furthers the goal that *Terry* was meant to further.  And—when coupled with his observations about the bag containing something "heavy," the thud sound of the item as it hit the side of the vehicle, and Williams's noncompliance with Officer Chaplain's order—Detective Small was simply frisking the bag to make the scene safer for officers (and, indeed, likely for Williams himself) due to his reasonable suspicion that Williams was in possession of a firearm.

Therefore, Detective Small had reasonable suspicion to frisk Williams's bag.

### III.  CONCLUSION

For these reasons, we reverse the trial court's judgment and remand the case for further proceedings.

*Reversed and remanded.*

Athey, J., dissenting.

The Fourth Amendment permits limited "intrusion[s] upon cherished personal security" when police officers can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 25 (1968). The majority holds that Detective Small satisfied this standard when he frisked Williams's crossbody bag during the course of a traffic stop initiated by another officer. For the reasons that follow, I respectfully dissent.

After a lawful investigative stop, police officers may frisk a suspect's personal effects when they "reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). An officer's reasonable suspicion, as the majority notes, must be supported by "specific and articulable facts" in combination with any "reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 21, 27. "The [reasonable-suspicion] standard 'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'" *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014)). So common sense is not checked at the door when reviewing the facts supporting reasonable suspicion. *See id.* at 383-84 (noting that inferences from evidence include "information that is accessible to people generally, not just some subset of society").

However, absent from the majority's reasoning is that this Court, with the procedural posture of the case, must "view the evidence in a light most favorable to [the defendant]." *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067 (1991). We are not limited to viewing only "conflicting evidence as resolved in the defendant's favor." *Commonwealth v. Holloway*, 9 Va. App. 11, 20 (1989). Viewing the evidence in the light most favorable to Williams also

- 14 -

includes "grant[ing] [the defendant] *all reasonable inferences* fairly deducible from that evidence." *Grimstead*, 12 Va. App. at 1067 (emphasis added).

Reviewing the evidence through this lens, I disagree with the majority and would hold that Detective Small did not have reasonable suspicion that Williams was armed. After assisting Officer Chaplain in pulling Williams out of the BMW, Detective Small believed Williams's bag had something "heavy" in it and heard Williams's bag make a "thud sound" when it was pushed against the BMW. But even after observing the bag to contain a heavy object and hearing the thud, Detective Small still testified that he "didn't know if it was just a phone or a wallet in there," making "no assumptions" as to the bag's contents. Taken together, these facts indicate that there was *something* in Williams's bag but nothing particularly pointing to that object being a firearm. Viewing this evidence in the "light most favorable to [the defendant]," Detective Small's observations cannot negate other objects that could be "heavy" and would make "thud sound[s]" when hit against a metal surface, indicating that he did not have reasonable suspicion that Williams was *armed*. *Grimstead*, 12 Va. App. at 1067.

The lack of specific, articulable facts supporting Detective Small's suspicion can also be inferred from his ambivalence about the bag itself. Rather than having any particular suspicions about the bag (or Willliams), Detective Small admitted that "[t]here was nothing in particular about [Williams's] bag or anything at that moment before [he] touched it" that aroused his suspicion. Detective Small only proceeded to take the bag from Williams pursuant to his "usual practice" arising from "assum[ing]" that other officers had asked Williams about a firearm, while further "assum[ing]" that a firearm was the reason "why [Officer Chaplain] was getting [Williams] out of the vehicle." Detective Small also admitted that he would have done the same thing whether Williams possessed other bags, such as a "bookbag" or a "purse." Hence, the detective seemingly acknowledged that neither Williams's bag nor Williams's actions

- 15 -

specifically indicated that the bag contained a firearm. Finally, Detective Small testified that "he did not know for certain" whether Officer Chaplain asked Williams about firearms nor why Officer Chaplain was ordering Williams out of the vehicle. These general observations, when properly viewed in the light most favorable to Williams, are akin to the "unparticularized suspicion[s]" that the Supreme Court derided in *Terry*. *Terry*, 392 U.S. at 27.

The problem with Detective Small's vague observations is compounded by the item that he chose to frisk: a crossbody bag. "Certainly, one may use a cross-body bag to carry" "countless objects" that contain "distinct, yet ubiquitous" attributes. *Robinson v. State*, No. 0269, slip op. at 16, 2025 Md. App. LEXIS 603 (Md. App. Ct. July 17, 2025). And as is the case with backpacks and bags, without some sort of specific and articulable observation of a firearm, the "sagg[ing] at the bottom [of a backpack] could have been the result of any number of things which it would [be] legal . . . to possess." *Matter of Jaquan M.*, 948 N.Y.S.2d 51, 55 (N.Y. App. Div. 2012). Indeed, the objective standard enunciated in *Terry* could not be satisfied when "any person on the street, even in a high-crime area, is presumed to be carrying a weapon based only on a drooping pocket or backpack," *id.*, namely because that person's "activity w[ould] [be] no different from the activity of other pedestrians in that neighborhood" and no specific observations would relate to the suspect himself, *Brown v. Texas*, 443 U.S. 47, 52 (1979). So without more—such as Officer Chaplain's observing a "rectangular" imprint against the outside of the bag or potentially incriminating testimony about Williams's behavior with the crossbody bag—Detective Small's assumptions about a widely utilized item fail, in my view, to be "specific and articulable" facts supporting a finding of reasonable suspicion required by *Terry*. *Terry*, 392 U.S. at 21.

I further note that there are a plethora of relevant facts in other cases supporting reasonable suspicion that are not present here. Detective Small did not testify, nor did his body-

worn camera footage depict, that he saw Williams suddenly clutch the bag when asked questions by officers. *See United States v. Cardona-Vincente*, 817 F.3d 823, 828 (1st Cir. 2016). He did not testify that he observed Williams being nervous, *see United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999), or "furtive" in the presence of law enforcement, *see United States v. Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007) (per curiam). In addition, *no* officer testified that Williams was stopped in a high-crime area, *see Hill v. Commonwealth*, 297 Va. 804, 816-17 (2019), that officers received a tip that Williams was in possession of a firearm, *see Bagley v. Commonwealth*, 73 Va. App. 1, 17-18 (2021), or that they even knew that Williams had a prior criminal history, *see Bazemore v. Commonwealth*, 82 Va. App. 478, 495 (2024). And most crucially, Detective Small testified that he "[was]n't privy to any of the conversations that [Officer Chaplain] or . . . Williams had" before he arrived at the scene, so we cannot impute *any* of Officer Chaplain's observations to Detective Small. *See McArthur v. Commonwealth*, 72 Va. App. 352, 365 (2020) (holding that the "'horizontal' aggregation[] of knowledge" is not imputed onto officers when they are not provided that information from others). Hence, it is my view that Detective Small's limited observations fell far short of the traditional indicia establishing that an officer has reasonable suspicion.

The majority supports its conclusion by leaning into Detective Small's prior experience with firearm detection. The majority specifically notes that Detective Small "previously encountered firearms in cross-body bags," which permitted him to infer from his "extensive training and experience in firearms detection and arrests" that Williams was armed. And I agree that Detective Small's prior experience has some role to play in determining whether he acted pursuant to a reasonable suspicion that Williams was armed. *See Terry*, 392 U.S. at 30.

However, I disagree with the majority that Detective Small's prior experience—when placed next to his vague observations and unparticularized reasons for grabbing Williams's

bag—supports an inference that Williams was armed. Even with an officer's prior experience, a basic requirement under *Terry* is that there be "specific and articulable facts" supporting an officer's reasonable suspicion that the suspect is armed. *Terry*, 392 U.S. at 21; *see State v. Maciel-Figueroa*, 389 P.3d 1121, 1128 (Or. 2017) ("[I]nstinct and experience cannot . . . form the entire basis for 'reasonable suspicion[]' because no practical control can be exercised over police by courts if, in the absence of any remarkable activity, the officer's instinct and experience may be used as the sole reason to justify infringement upon the personal liberty sought to be protected." (first alteration in original) (quoting *State v. Valdez*, 561 P.2d 1006, 1010-11 (Or. 1977))). As such, prior experience only supports "reasonable inferences which [the officer] is entitled to draw *from the facts*" supporting their observations. *Terry*, 392 U.S. at 27 (emphasis added). Hence, it is my view that Detective Small's prior experience cannot adequately replace the dearth of specific facts supporting his purported suspicion that Williams was armed, especially when the facts are taken in the light most favorable to Williams.

As outlined by *Terry* decades earlier, "central" to the Fourth Amendment is a "demand for specificity in the information upon which police action is predicated." *Terry*, 392 U.S. at 21 n.18. Detective Small's observations fall far short of this demand. And "[i]n the absence of any basis for suspecting appellant of [being armed], the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." *Brown*, 443 U.S. at 52. Thus, when the evidence is "view[ed] . . . in a light most favorable to [the defendant]" and "all reasonable inferences fairly deducible from that evidence" are "grant[ed] [to the defendant]," *Grimstead*, 12 Va. App. at 1067, I would find that the trial court did not err by finding that Detective Small's observations and assumptions only amounted to "inarticulate hunches" that did not satisfy the objective standard set out in *Terry*, 392 U.S. at

21. Therefore, I would have affirmed the trial court's judgment granting Williams's motion to suppress.[9]

---

[9] While the majority does not address the issue, I also would hold that Officer Chaplain would not have inevitably discovered the firearm. "[T]he doctrine of inevitable discovery" provides that "evidence obtained by unlawful means is nonetheless admissible '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *Commonwealth v. Jones*, 267 Va. 532, 536 (2004) (second alteration in original) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The Commonwealth must meet its burden with "demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5.

This doctrine, upon my review, has never been applied by any Virginia court to a situation where a police officer would frisk a person or item that was *already frisked* by another officer. However, assuming without deciding that this Court may apply the doctrine of inevitable discovery in this context, I would simply hold that the Commonwealth did not meet its burden because the record is devoid of evidence on how Officer Chaplain would have conducted his future frisk. *See State v. Beltran*, 300 P.3d 92, 105 (Kan. Ct. App. 2013) (holding that evidence would not have been inevitably discovered because "[n]othing in the record suggest[ed] a properly conducted pat-down would have caused [the officer] to reasonably mistake . . . plastic bags and their contents for a weapon or to correctly recognize them to be likely contraband"); *see also United States v. Holmes*, 505 F.3d 1288, 1293-94 (D.C. Cir. 2007) (holding that evidence would not have been inevitably discovered because the record only showed "nothing more than possibility" that officers would have found the evidence through a frisk).